**OCCIDENTAL LIFE INSURANCE COMPANY OF CALIFORNIA, a California corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 62–332.

United States District Court
S. D. California,
Central Division.

Dec. 14, 1965.

————♦————

O. L. Frost, Jr., John G. Gemmill, Robert M. Sweet, Stanley Abrams, Forster, Gemmill & Farmer, Los Angeles, Cal., for plaintiff.

Manuel L. Real, U. S. Atty., Loyal E. Keir, Asst. U. S. Atty., Chief, Tax Division, Martin B. Cowan, Atty., Dept. of Justice, Los Angeles, Cal., for defendant.

CURTIS, District Judge.

This is a suit for the refund of federal income taxes and interest for the taxable years 1954 and 1955. Jurisdiction is conferred upon this court by Title 28 U.S.C.A. 1340 and 1346(a) (1).

Plaintiff is a stock life insurance company, organized under the laws of the State of California, its principal place of business being in Los Angeles. During the calendar years in question, it was engaged in the insurance business in the United States, Canada and other parts of the world, and it was and is a life insurance company as that term is defined in § 801(a) of the Internal Revenue Code of 1954.

This action presents the following two principal questions:

1. Is a tax upon life insurance premiums imposed upon the plaintiff by the Dominion of Canada and the Province of Quebec an "income tax" or a "tax paid in lieu" thereof, either one of which are allowable as foreign tax credits within the meaning of §§ 841, 901 and 903 of the Internal Revenue Code of 1954?

2. In making the "adjustments for certain reserves"—as required by § 805 of the Internal Revenue Code of 1954 and as defined by § 806—in the computation of its 1954 life insurance taxable income, was plaintiff required to include under the category of "unpaid losses" amounts representing accrued, but unpaid, policy liabilities as well as amounts representing unaccrued claims?

### FOREIGN TAX CREDITS

Section 901(b) of the Internal Revenue Code of 1954 provides that a domestic corporation shall be allowed, as a credit against its general income tax, the amount of any income taxes paid or accrued during the taxable year to any foreign country.[1]

Section 903 provides that the term "income taxes" shall include any tax paid "in lieu of a tax paid on income" otherwise imposed by any foreign country.[2]

Section 841 provides in effect that the provisions of §§ 901 and 903 shall extend to life insurance companies.

During the years 1953 and 1954 the Province of Quebec imposed a tax of 2 percent on the net premiums received by non-resident stock life insurance com-

---

1. Title 26 U.S.C. § 901. Taxes of foreign countries and of possessions of United States

    *      *      *      *      *

    (b) Amount allowed.—Subject to the limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

    (1) Citizens and domestic corporations. —In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States * * *.

    *      *      *      *      *

2. Title 26 U.S.C. § 903. Credit for taxes in lieu of income, etc., taxes

    For purposes of this subpart and of section 164(b), the term "income, war profits, and excess profits taxes" shall include a tax paid in lieu of a tax on income, war profits, or excess profits otherwise generally imposed by any foreign country or by any possession of the United States.

panies in Quebec, and during the same period the Dominion of Canada likewise imposed a 2 percent tax on the net premiums received by non-resident stock life insurance companies in other portions of Canada. Since the plaintiff is a cash basis taxpayer, these taxes, although levied in 1953 and 1954, were actually paid in the years 1954 and 1955, and therefore enter into a computation of plaintiff's United States income taxes for the respective years of payment, namely, 1954 and 1955, the years which are now in question in this action.

Plaintiff first contends and strongly urges that the net premiums taxed by both Quebec and the Dominion of Canada are part of the gross income of life insurance companies, and it points out that for a hundred years Congress has habitually measured income taxes on insurance companies in whole or in part upon premiums. When Congress first enacted the foreign tax credit provisions in 1918, premiums were considered to be an item of income of insurance companies for tax purposes. Commissioner of Internal Revenue v. Monarch Life Ins. Co., 114 F.2d 314 (1st Cir. 1940). Plaintiff concludes that, since gross income has been recognized as a proper basis for taxation by Congress and our courts, a tax upon net premiums is actually an income tax within concepts generally recognized in this country. Although under the law applicable to the years here in issue, gross income and premium income were not then being taxed, nevertheless a tax thereon imposed by a foreign country was an income tax. There are several cases to the contrary. Continental Insurance Company v. Commissioner, 40 B.T.A. 540 (1939); St. Paul Fire &

Marine Ins. Co. v. Reynolds, 44 F.Supp. 863 (Dist.Ct.Minn.1942).

In Northwestern Mut. Fire Ass'n v. Commissioner of Internal Revenue, 181 F.2d 133 (9th Cir. 1950), the court assumed, without holding, that premiums taxes were not income taxes since not measured by net income, and it was apparently the tendency of the courts to follow this narrow concept which gave rise to the passage of § 131(h) of the Internal Revenue Code of 1939 which became § 903 of the Internal Revenue Code of 1954. The Senate committee reports as a reason for the enactment of this section as follows:

> "In the interpretation of the term 'income tax' the Commissioner, Board and the courts have consistently adhered to a concept of income tax rather closely related to our own, and if such foreign tax was not imposed upon a basis corresponding approximately to net income, it is not recognized as a basis for such credit." (Report, Senate Finance Committee, 77th Cong. 2d Sess. S. Rep. 1631, pp. 131 and 132).

Although much can be said in defense of plaintiff's first contention, there is rather substantial authority to the contrary. And since it seems reasonably clear that the premium tax in question was imposed both by the Province of Quebec and the Dominion of Canada in lieu of income taxes generally imposed upon others, I prefer to base my ruling upon the latter ground.

Let us first consider the problem arising in the Province of Quebec. During the years in question Quebec had in effect a "Corporation Tax Act", Section 3[3] of which, entitled "Taxes on Paid Up

3. TEXT OF PERTINENT PROVISIONS OF QUEBEC CORPORATION TAX ACT IN EFFECT DURING CALENDAR YEAR 1941 (REV.STAT. OF QUEBEC, 1941, C. 77)
" * * * *
3. In order to provide for the exigencies of the public service of the Province, every one of the following companies, corporations, partnerships, associations, firms, business houses and persons, doing

business in this Province, in his or its own name or under a firm name or through any person paid by salary or commission or in any other manner, acting as employee, vendor, agent, representative or otherwise, shall pay annually to His Majesty in the rights of the Province, at the time and in the manner hereinafter provided, the following taxes:
* * * * *
"3. Insurance Companies

Capital and Places of Business" classifies corporations doing business in Quebec into some 19 separate categories and imposes a different tax upon each of a character appropriate to the peculiarities of each class of taxpayer. Subdivision 1 of Section 3 imposes generally upon "ordinary companies" (other than companies specially taxed under other subdivisions of Section 3) a tax of ⅒ of one percent of the amount of paid up capital, plus $50.00 for each place of business in the cities of Montreal and Quebec and $25.00 for each place of business in other municipalities, subject to certain adjustments therein provided. Most categories of taxpayers are taxed upon some percentage of paid up capital or reserve funds, together with a flat amount for each place of business. However subdivision 3 relating to insurance companies, while imposing no tax on paid up capital or places of business, imposes a tax of two percent on net premiums received by a stock life insurance company on business done in the Province.

In Section 6 of the Act, an additional "income tax" of seven percent is imposed generally upon all corporations with few exceptions, one of which is life insurance companies as to which no income tax is imposed under this section. Under these circumstances this court is called upon to decide whether the imposition of the tax as provided by Section 3 upon life insurance companies is imposed in lieu of income taxes. The statute itself is silent as to any legislative intent.

■ Taxing authorities and courts have had much difficulty in attempting to impose income taxes on life insurance companies. Although premiums were at one time included in gross income for tax purposes under our laws, this was deemed to be unsatisfactory and was discontinued. We must assume, I think, that the legislative council and Assembly in Quebec in enacting the Corporation Tax Act intended to impose a tax upon all corporations which was fair and equitable as possible. Recognizing the difficulties entailed in taxing life insurance companies upon the same basis as other corporations, they were exempt from the tax on paid up capital and places of business and also the general income tax imposed upon other corporations, and in lieu thereof were taxed upon the net premiums. I see no basis to hold that the premium tax was in lieu of a place of business tax any more than the premium tax was in lieu of the general income tax. It appears, in fact, as if the premium tax was levied in lieu of the tax upon paid up capital and places of business and the general income tax. I do not read § 903 as requiring that the premium tax be in lieu of the income tax exclusively or solely.

Turning now to the income tax of the Dominion of Canada, Chapter 148 of the Revised Statutes of Canada, 1952, imposes a tax upon the net income of the corporations generally. Section 30 defines taxable income of life insurance corporations as the aggregate amounts credited shareholders' account or otherwise appropriated for, or on account of, shareholders during the year. It appears to have been an administrative policy of the Department of National Revenue in Canada to consider non-resident life insurance companies as not having shareholders' accounts in Canada within

"In the case of every insurance company, a tax of two percentum on every premium received by the company or its agent or agents in respect of the business transacted in Quebec.

　　*　　*　　*　　*　　*

"6. In addition to the taxes on capital and upon places of business mentioned in this act, every company, partnership or person contemplated by subdivisions 1, 4, 5, 6, 7, 8, 11, 13, 14, 15, 16, 17, 18 and 19 of section 3, every holding company and every mining company whose annual profits are not taxed under the Quebec Mining Act (Chap. 196), having its head office or an office in the Province or which is carrying on business therein, directly or through a person paid by salary, commission or otherwise, acting as employee, vendor, agent, representative or in any other capacity, shall pay an annual tax of five per centum calculated on its total net revenue for the calendar year immediately preceding the date when the present tax is exigible."

the meaning of Section 30. So that for all intents and purposes, Section 30 exempts each non-resident life insurance company from paying an income tax upon its Canadian income. By a special act entitled "Canadian Excise Tax Act of 1947" a tax of two percent is imposed upon the net premiums of a life insurance company received by it in Canada. Here again we have no statutory declaration of intention, but it seems clear, for the reasons discussed with respect to the Quebec tax, that the Dominion of Canada premiums tax was imposed in lieu of the general income tax, from which the plaintiff was expressly exempt.

In Prudential Insurance Company of America v. United States, 319 F.2d 161 (Ct.Cl.1963) the court had before it almost the identical problem as it related to the year 1949 and concluded that taxes on insurance premiums paid to the Canadian jurisdictions came within the meaning of the phrase "tax paid in lieu of a tax upon income". Subsequently the same court in Prudential Insurance Company of America v. United States, 337 F.2d 651 (Ct.Cl.1964) again considering the foreign tax credit issue (this time with respect to the years 1950 through 1956) came to the same conclusion. Almost the identical problem is now before the Court of Claims in the case of The Equitable Life Assurance Society of the U. S. v. United States. On August 25, 1965, Commissioner Maston G. White of that court filed an opinion which is now being considered by the Court of Claims. Although the Commissioner reached the same conclusion as the court had reached in the previous cases, he said:

> "In the present litigation, unlike the *Prudential* cases, the court has before it a record that contains testimony presented by the defendant regarding the history of premiums taxes and income taxes in Canada. The evidence in the record on this point, and summarized in the findings, shows persuasively that, as a matter of historical fact, the plaintiff and other similar American insurance companies doing business in Canada were not exempted from the payment of Canadian income taxes because they paid premium taxes there, and, conversely, that the imposition of Canadian premiums taxes on the plaintiff and other similar American insurance companies was not due to the circumstances that they were exempted from the payment of Canadian income taxes. If the historical information presented by the plaintiff (apparently 'defendant' is intended) in the present litigation had been before the court for consideration in connection with the first *Prudential* case—and such information was as readily available for development by the defendant in the defense of that suit as it was several years later—it might have persuaded the court to a different conclusion with respect to the question as to whether Canadian premiums taxes did or did not come within the category of 'a tax paid in lieu of a tax upon income' ".

The Commissioner ultimately held that under the rule of stare decisis he felt compelled to recommend to the Court of Claims that the premium tax paid to the Province of Quebec and Dominion of Canada were taxes "paid in lieu of a tax upon income".

Much historical information was likewise presented to this court, some supporting the Government's position and some supporting the plaintiff's contentions. From such testimony this court can only conclude that in Canada the income tax and the premium tax spring from different and divergent concepts and that from the Canadian viewpoint a premium tax is not akin to or in the nature of an income tax. Nevertheless, this does not mean that a premium tax cannot be imposed in lieu of an income tax. Whatever may be the historical background, it would appear that during the years in question the plaintiff was exempt from a general income tax levied upon other corporations because of the premium tax. We think the decisions in

the Prudential cases when related to the facts here represent sound logic and a proper result.

Defendant contends that the Canadian premium tax cannot be in lieu of an income tax but is in fact in addition to a general income tax. During the years in question, Canada imposed on nonresidents, under Part III, a tax upon the income from Canadian investments. Plaintiff paid such a tax. However, it appears that this tax was applicable only to income from investments unrelated to plaintiff's Canadian insurance business. The plaintiff was also subjected to another Canadian tax. Under Part I the plaintiff was taxed on its health and accident insurance business, which it was conducting in addition to its life insurance business. As to such business, the plaintiff was treated by Canadian administrative arrangement as one not engaged in the life insurance business. The fact remains that a Canadian tax on life insurance premiums was paid by the plaintiff in lieu of an income tax on *life insurance business.*

█ I hold, therefore, that the premium taxes imposed by the Province of Quebec and the Dominion of Canada are taxes imposed in lieu of income taxes generally imposed by the Province and the Dominion and are, therefore, allowable as foreign tax credits under § 901 (b) of the Internal Revenue Code of 1954.

### ADJUSTMENT FOR CERTAIN RESERVES

The Internal Revenue Code of 1954 introduced a rather radical change in the method of taxing life insurance companies, and in order to assist such companies to adjust more easily to the new tax, income received during the year 1954 was taxed upon a slightly different basis than that used in earlier years or than that which the Code provided for the years to follow.

Our problem relates to this "1954 Life Insurance Company Taxable Income" as it is called in § 805(a). This "1954 Life Insurance Company Taxable Income"

was computed by applying a rather complex formula. One of the factors with which the formula deals is the amount of "adjustment for certain reserves".

Section 806 provides for the "Adjustment of Certain Reserves" as follows:

"In the case of a life insurance company writing contracts other than life insurance or annuity contracts (either separately or combined with noncancellable health and accident insurance), the term 'adjustment for certain reserves' means an amount equal to $3\frac{1}{4}$ percent of the unearned premiums and unpaid losses on such other contracts which are not included in life insurance reserves * * *."

In preparing its income tax return for the year 1954 and in computing the amount of "adjustment for certain reserves" to be included in the definition of taxable income, the plaintiff with respect to the item of "unpaid losses" included $3\frac{1}{4}$ percent of the amount of $3,788,368.83 held by it as reserves against *unaccrued liabilities* arising from cancellable health and accident contracts, but plaintiff did not include in this computation $3\frac{1}{4}$ percent of the amount of $4,707,914.46, its *accrued*, but unpaid, liabilities arising from such contracts. A deficiency was therefore assessed, based upon an administrative determination that plaintiff's accrued, as well as its unaccrued liabilities in respect to unsettled policy claims should have been included in the "adjustment for certain reserves".

It was stipulated that "accrued" liabilities, such as the Commissioner contends should have been included in "unpaid losses" are typified in the following examples:

1. Plaintiff's obligation to pay a lump sum payment for death or dismemberment under the terms of a cancellable health and accident policy at any given time after the accident and before payment, regardless of what stage of the adjustment procedure has been reached and even though the claim was going to be resisted.

2. Plaintiff's obligation at any given time to pay any benefits already enjoyed, such as hospital, doctors' or surgical services after the accident or inception of any sickness, but before any payment whether the amounts were actually known or not.

It was further stipulated that unaccrued liabilities, which plaintiff did in fact include in its computation and which it contends is the only type of liability to which "unpaid losses" refers, is typified by the following example:

Plaintiff's obligation to pay future benefits under a contract of cancellable health and accident insurance because of the occurrence of an accident or inception of a sickness which had already occurred, but on account of which such further and future benefits were likely to be required. Such an obligation being uncertain and contingent is therefore unaccrued.

To pay these future benefits (unaccrued liabilities) the plaintiff set up as a reserve such amount as would on the average be sufficient to cover its liabilities and such reserve was determined by actuarial computations, modified in the light of recent experience.

Plaintiff's argument is simply this: In enacting § 806 which, as its title implies, deals with reserves, Congress meant "technical" reserves. Technical reserves, by definition, do not and cannot include funds held for payment of accrued liabilities, and therefore the reference in § 806 to a reserve for unpaid losses, being a technical reserve, cannot include funds held for payment of accrued liabilities. With this conclusion we agree.

■ Technical reserves has a definite meaning in the field of insurance taxation. In Commissioner of Internal Revenue v. Monarch Life Ins. Co., 114 F.2d 314 (1st Cir. 1940) the Court of Appeals of the First Circuit was dealing with various types of reserves which the taxpayer insurance company claimed it was entitled to maintain. The Commissioner claimed that these were not true reserves for the purpose of the statute. In holding that each of the claimed reserves qualified as "technical insurance reserves", the court emphasized that each was calculated upon the basis of selected tables of mortality or disability, that the source of the reserve was premium payments and income from the investment thereof, and that *the claim against which the reserve was maintained was not accrued, that the extent of probable liability in the amount of the reserve created was uncertain and contingent, and that the reserve was held by the taxpayer against claims of insurance that are future, unaccrued, and contingent.* See also Pan-American Life Insurance Co., 38 B.T.A. 1430 [aff'm 111 F.2d 366 (5th Cir.), affirmed 311 U.S. 272, 61 S.Ct. 210, 85 L.Ed. 183]; Oregon Mutual Life Insurance Co., 39 B.T.A. 1239 [affirmed 9 Cir., 112 F.2d 468 and affirmed 311 U.S. 267, 61 S.Ct. 207, 85 L.Ed. 180].

In The Equitable Life Assurance Society of the U. S. v. Commissioner, 44 B.T.A. 239 (1941), the Board of Tax Appeals in reliance on the foregoing decisions held that funds held to cover certain contingencies were true reserves, but held that one fund claimed by a taxpayer to be a reserve for "supplementary contracts not involving life insurance contingencies" did not qualify as a reserve stating:

"* * * the supplementary contract reserves of petitioner represent amounts of assets retained to meet the company's liabilities upon insurance policies which had already matured. They do not represent assets held against unmatured policies."

Even the Treasury Department in its Regulations 103, Section 19.201–4, 1943 Cum.Bull. 512 recognized a clear distinction between reserves for payment of liabilities which have accrued by reason of

becoming fixed and definite in amount. The Regulation provides:

"* * * life insurance reserves do not include reserves required to be maintained to provide for ordinary running expenses of a business definite in amount, and which must be currently paid by every company from its income if its business is to continue, such as taxes, salaries, and unpaid brokerage; nor do they include * * * liability for premiums paid in advance; * * * *liability for accrued but unsettled policy claims whether known or unreported.* * * *" (Emphasis added).

Once a liability, definite in amount, becomes accrued, or once the event occurs and brings about its becoming definite in amount, it becomes a firm liability and is therefore a liability against which a true reserve cannot be set up.

An examination of the statute as a whole will indicate that Congress was referring to reserves in the technical sense.

The words "unpaid losses" are first found in § 801 of the 1954 Code, which defines life insurance companies. This section is a virtual re-enactment of subsection 201(b) of the 1939 Code which reads:

"(b) *Definition of life insurance company.* When used in this chapter, the term 'life insurance company' means an insurance company * * * the life insurance reserves * * * plus *unearned premiums and unpaid losses* on noncancellable life, health, or accident policies not included in life insurance reserves, of which comprise more than 50 per centum of its total reserves. For the purpose of this subsection, *total reserves* means *life insurance reserves, unearned premiums and unpaid losses not included in life insurance reserves,* and all other insurance reserves required by law. * * * *"

The identical language of this section was carried over into the Act of 1942, against the background of the decisions of the court in the *Monarch, Oregon Mutual, Pan American* and *Equitable* cases, *supra,* and also the recognition by the Treasury Department that life insurance reserves can include only items that constitute "technical insurance reserves" and do not include accrued policy liabilities.

■ This statute is a precise and technical statute, and where certain words have a precise and technical meaning in the field in which the legislation is enacted, such as is indicated by court decisions and Treasury Regulation hereinabove referred to, we may assume that Congress intended them as words of art to be construed in their technical sense.

The defendant relies upon the case of Prudential Insurance Company of America v. United States, 319 F.2d 161 (Ct. Cl.1963) where the court held, in a very brief opinion, that the words "unpaid losses" included accrued as well as unaccrued losses since these words are clear and unambiguous and should be given effect according to their plain and obvious meaning. However, many contentions have been made here which were not discussed by that court.

To construe "unpaid losses" as including accrued liabilities in § 801 would certainly not be consistent with the obvious intent of the statute, for to so construe it would be to draw into the definition of life insurance companies other insurance companies which did not have adequate qualified reserves to make them taxable as life insurance companies, but would nevertheless come within the definition because of the addition of accrued liabilities to their technical reserves. If "unpaid losses" were meant to include only accrued liabilities in § 801, "unpaid losses" should be given the same meaning and interpretation when used in § 806.

Furthermore, such an interpretation of § 806 is consistent with the obvious purpose of the section.

In the recent years prior to and including 1954, premium income had not been included in the taxable income of life insurance companies on the assumption that it was all either retained to pay claims or returned to policy holders. The gross taxable income of life insurance companies consisted primarily of investment income. Furthermore, since life insurance companies were required by law to pay into their reserves annual sums by way of interest, life insurance companies were allowed a deduction to compensate them for such interest payments.

From 1921 and until 1942, this was effected by allowing a deduction of a percentage of the life insurance company's technical reserve funds [see I.R.C.1938, § 203(a) (2)].

In 1942 [concurrently with the enactment of § 202(c), which was the predecessor to § 806 of the 1954 Code], Congress substituted for this deduction the "Reserve and Other Policy Liability Credit", to be determined and proclaimed by the Secretary of the Treasury each year according to a formula [§ 202(b) I.R.C.1939, as amended, 1942]. This became known as the "Secretary's Ratio". The prescribed formula consisted of many elements, but an examination of Congressional Committee Reports accompanying its enactment, and the enactment of § 202(c), discloses that the purpose was to reach and tax the cancellable accident and health business of life insurance companies which had previously escaped taxation, and that this was to be effected by adding back to the tax base the portion of the deduction allocable to income on cancellable accident and health reserves which were being allowed through the "Reserve and Other Policy Liability Credit" resulting from the application of the "Secretary's Ratio". (Report of Ways & Means Committee, 77th Cong., Second Sess., H.Rept. 2333, pp. 111–12; Report, Sen.Fin. Committee, 77th Cong., Second Sess., S.Rept. 1631, pp. 148–149) It appears from these Reports that 3¼% was believed to be the average rate of interest that is allowed to life insurance companies.

The Treasury Department agreed that this was the purpose. In Regulations 103, Section 19.202–2, 1943 C.B., p. 517, it said:

"A life insurance company writing contracts other than life insurance or annuity contracts * * * must add to its normal-tax income and to its corporation surtax net income, *as an offset to its reserve and other policy liability credit*, an amount equal to 3¼ per cent of the mean of the unearned premiums and unpaid losses at the beginning and end of the taxable year on such other contracts as are not included in life insurance reserves. * * *" (Emphasis added)

Non-life insurance companies, i. e., insurance companies not coming within the definition of life insurance companies as defined in Section 801, were taxed upon a different basis, one aspect of which was that they were not allowed a Reserve and Other Policy Liability Deduction (as it was called in the 1954 Code). So when both types of insurance companies were doing a non-life insurance business (such as cancellable accident and health business), one taxpayer would be receiving a Reserve and Other Policy Liability Deduction on a particular portion of its business, whereas the other would not. It was to correct this inequity that the predecessor to Section 806 was enacted. The effect of Section 806 was to require true life insurance companies (companies which were then receiving a Reserve and Other Policy Liability Deduction, or, as was the case for the year 1954, its equivalent, on the income on all true reserves connected with their insurance business) to add back to their taxable income an amount substantially equal to the "Reserve and Other Policy Liability Deduction" on the income on reserves held in connection with their non-life business. This was accomplished by bringing into

their net taxable income computation 3¼ per cent of their non-life insurance reserves. It is clear, however, that in calculating the Reserve and Other Policy Liability Deduction, or its equivalent, allowed to life insurance companies, only technical reserves could be included, and a reserve and other liability deduction for accrued losses would not be allowed in the first place. (See Treasury Dept. Regs. 103, Section 19.201–4, Cum.Bul. 1943, supra).

In requiring life insurance companies, therefore, to bring back into their taxable income computation that portion of the "Reserve and Other Policy Liability Deduction", or its equivalent, as relates to their non-life insurance business, the same basis for computing the Adjustment for Certain Reserves should be used.

Let us assume that plaintiff's funds set aside for the payment of accrued policy liabilities produce a net income from investments of 3¼ per cent. This amount would be taxed without the benefit of any Reserve or Other Policy Liability Deduction, or its equivalent, as this fund would clearly not qualify under applicable provisions of the Statute and Treasury Regulations. If Section 806 be considered as requiring the plaintiff to add to its taxable income computation another 3¼ per cent of this fund, this would result in the net income from the fund being included twice in the tax computation. Certainly Congress did not intend Section 806 to be construed in this fashion.

Plaintiff was, therefore, correct in excluding from the computation of the amount of "Adjustment for Certain Reserves" in its 1954 income tax return 3¼ per cent of its accrued but unpaid liabilities arising from its non-life insurance business.

Let judgment be entered in favor of plaintiff as prayed.