**UNITED STATES of America,**
**Appellant,**

v.

**OCCIDENTAL LIFE INSURANCE COM-**
**PANY OF CALIFORNIA, a Califor-**
**nia corporation, Appellee.**

**No. 21039.**

United States Court of Appeals
Ninth Circuit.

Oct. 26, 1967.

Mitchell Rogovin, Asst. Atty. Gen.,
Lee A. Jackson, Atty., Martin Goldblum,
Atty., Tax Div., Dept. of Justice, Wash-
ington, D. C., William M. Byrne, Jr., U.
S. Atty., Los Angeles, Cal., for appellant.

John G. Gemmill, Forster, Gemmill &
Farmer, Los Angeles, Cal., for appellee.

Before JERTBERG, BROWNING, and
ELY, Circuit Judges.

ELY, Circuit Judge:

The Government appeals from a Dis-
trict Court judgment which awarded tax-
payer a refund of federal income taxes
for the taxable years 1954 and 1955.[1]
Suit was instituted by the taxpayer pur-
suant to 28 U.S.C. § 1346(a) (1) after its
claims for refund had been rejected.
Our jurisdiction rests upon 28 U.S.C. §
1291.

The taxpayer is a stock life insurance
company. For taxable years beginning
in 1954, such companies were subject to

---

1. The decision of the District Court is reported at 250 F.Supp. 130 (S.D.Cal.1965).

a tax equal to certain percentages of "1954 life insurance company taxable income." Section 805(a) of the Internal Revenue Code of 1954, ch. 736, 68A Stat. 258, provided that "the term '1954 life insurance company taxable income' means the taxable income * * *, plus 8 times the amount of the adjustment for certain reserves provided in section 806, and minus the reserve interest credit * * *." Computation of the "adjustment for certain reserves" was fixed in section 806 of the Code, which provided:

"In the case of a life insurance company writing contracts other than life insurance or annuity contracts (either separately or combined with non-cancellable health and accident insurance), the term 'adjustment for certain reserves' means an amount equal to 3¼ percent of the unearned premiums and unpaid losses on such other contracts which are not included in life insurance reserves (as defined in section 803(b). For purposes of this section, such unearned premiums shall not be considered to be less than 25 percent of the net premiums written during the taxable year on such other contracts."

Int.Rev.Code of 1954, § 806, ch. 736, 68A Stat. 259 (formerly Int.Rev.Code of 1939, § 202(c), as amended, ch. 619, § 163(a), 56 Stat. 870 (1942)).

In computing its "adjustment for certain reserves" so as to determine its taxable income for the year 1954, the taxpayer included as "unpaid losses" the December 31, 1953, to December 31, 1954, mean of its "reserve for amounts not yet due on claims and for future contingent benefits," an account representing unaccrued liabilities on its cancellable health and accident policies.[2] Omitted from this computation, however, was the amount of $4,707,914.46, which represented the mean, for the same period, of taxpayer's accrued but unpaid liabilities on such non-life policies.[3] The Commissioner ruled that the last mentioned amount should have been included within "unpaid losses" in determining taxpayer's "adjustment for certain reserves" and assessed a deficiency of $79,563.76. The District Court held that the taxpayer's accrued but unpaid liabilities arising from its cancellable health and accident policies were not properly treated as "unpaid losses" and awarded a refund of the assessment, plus interest.

Appellee also sought refunds on the basis of section 841 of the Internal Revenue Code of 1954, which provides, "The taxes imposed by foreign countries * * * shall be allowed as a credit against the tax of a domestic insurance company * * * to the extent provided in the case of a domestic corpora-

2. By stipulation of the parties, the following is an example of an unaccrued liability:
"Upon the occurrence of an accident or the inception of a sickness as a result of which Occidental, under the terms of a cancelable health and accident insurance contract, was required to pay benefits toward hospital, medical, or surgical bills, Occidental had also to provide for the anticipated benefits. Occidental's obligation with respect to these benefits was then unaccrued to the extent that this accident or sickness would require payment in the future, since nothing was then due, and the amount of its potential liability was contingent upon the disabled person's survival, his continued disability, and the continued incurrence of hospital, medical, or surgical bills. To provide for these future benefits, Occidental set up as a reserve such amount as would, on the average, be sufficient to cover its liability."

3. By stipulation of the parties, the following is an example of an accrued liability:
"Upon the occurrence of an accident under circumstances requiring Occidental, under the terms of a cancelable health and accident insurance contract, to pay a lump-sum benefit for death or dismemberment, the lump-sum death or dismemberment benefit became an indebtedness of Occidental which was immediately due and payable, subject to submission of the required application and proof. At any given time after the accident and prior to payment of the claim, the obligation to pay the lump-sum benefit constituted an accrued but unpaid liability, regardless of what stage had then been reached in the adjustment procedure or whether the claim was being resisted."

tion in section 901 * * *." Section 901(b) (1) of the 1954 Code allows as a credit "the amount of any income, war profits, and excess profits taxes paid * * * to any foreign country * * *." Furthermore, section 903 extends this credit to "a tax paid in lieu of a tax on income, war profits, or excess profits otherwise generally imposed by any foreign country * * *."

This second refund claim involves both 1954 and 1955, during which years the taxpayer paid certain taxes to the Dominion of Canada and to the Province of Quebec. The Dominion tax, levied pursuant to the Dominion Excise Tax Act, Can.Rev.Stat. c. 100, § 4(1) (1952), was equal to two percent of net premiums received from policy holders resident in Canada, less a credit equal to the Quebec tax. The latter was prescribed by the Quebec Corporation Tax Act, Statutes of Quebec, 11 Geo. 6, c. 33, § 3(3) (1947), and equalled two percent of net premiums received from life insurance business in Quebec. The District Court awarded refunds of $58,599.94 and $77,434.01, plus interest, for the respective years 1954 and 1955, on the ground that appellee was entitled to credit under section 841 for its payment of these Canadian taxes.

The two questions which confront us, therefore, are as follows:

1. In computing its "adjustment for certain reserves," was the taxpayer required to include as "unpaid losses" the amount of its accrued but unpaid non-life policy liabilities, as well as the amount of its unaccrued claims?

2. Were the Canadian premiums taxes imposed upon and paid by the taxpayer either income taxes or taxes paid in lieu thereof, so as to be allowable as foreign tax credits?

## UNPAID LOSSES

The scope of the term "unpaid losses" has been previously considered in Prudential Ins. Co. of America v. United States, 319 F.2d 161, 165–166, 162 Ct.Cl. 55, 65 (1963). There, the Court of Claims specifically held that the term "unpaid losses" as used in section 806 includes accrued but unpaid liabilities, in addition to similar unaccrued claims. The taxpayer contends, as the District Court indicated, that this decision lacks persuasive force because the court there did not specifically deal with many contentions which the present taxpayer has advanced. Even so, we are convinced that the Court of Claims reached the correct conclusion.

In order to understand the significance of "unpaid losses" as used in section 806, it is necessary to review the development of the method of taxation of life insurance companies which existed in 1954.[4] After 1921, life insurance companies were not required to include the amount of premiums received in the computation of their gross incomes. Under section 803 (a) (2) of the 1954 Code, ch. 736, 68A Stat. 256, as well as under the provisions of the prior law,[5] life insurance company gross income was confined to "interest, dividends, and rents." This treatment represented recognition of the unique nature of a life insurance company's underwriting business.

Many forms of insurance involve short-term, cancellable contracts, wherein the premium rate may be periodically adjusted to reflect the current risk. In contrast, premiums received on level-

4. The original provisions of the 1954 Code, which are controlling in the instant case, were subsequently revised by the Life Insurance Company Tax Act for 1955, ch. 83, 70 Stat. 36 (1956). The application of this Act was subsequently extended for the following years. Finally, the years of "stopgap" acts in this area were ended by the Life Insurance Company Tax Act of 1959, Pub.L.No. 86–69, 73 Stat. 112, which substantially revised the entire structure of income taxation of insurance companies. Although the provisions of the 1959 Act are not applicable here, it is noteworthy that wherever "unpaid losses" is used in the new Act, the phrase "(whether or not ascertained)" is added to it. See Int.Rev.Code of 1954, § 801.

5. See Int.Rev.Code of 1939, § 201(c) (1), as amended, ch. 619 § 163(a), 56 Stat. 868 (1942).

premium life insurance policies represent both the cost of protection for the year of receipt and also the cost of establishing or enhancing a reserve fund, which must be accumulated at interest to provide protection for future years, since the event insured against is certain to occur and since the probability of occurrence increases with each successive year. The bulk of a life insurance company's receipts, consisting primarily of premiums and the return on investment of reserves, will eventually be returned to policy holders or their beneficiaries when the reserve fund is tapped for payment of claims. See generally 8 Mertens, Law of Federal Income Taxation §§ 44.16–.17, at 35–39 (rev. ed. 1964). Only a small percentage of those receipts represents true income, since the company generally derives profit only insofar as the returns on the investment of its reserve funds exceed the rate of interest at which the company is required to supplement its reserves. Thus, in addition to excluding premium payments from income, part of the investment income of a life insurance company should also be excluded from income taxation. That income is added to reserves and will also eventually be returned to the policy holders.

The original provisions of the 1939 Code defined a "life insurance company" as an insurance company engaged in the business of issuing life insurance and annuity contracts whose reserve funds for fulfilling such contracts comprise more than 50 percent of its total reserve funds. Int.Rev.Code of 1939, § 201(a), ch. 2, 53 Stat. 71. However, once an insurance company qualified under this definition, all of its insurance contracts were treated identically, regardless of the fact that the company may have also sold cancellable, non-life insurance policies. In order to allow for the required additions to the reserves from its investment income, a company meeting the definition was allowed deduction of a certain percentage of the "mean of the reserve funds required by law." Int.Rev.Code of 1939, § 203(a) (2), 53 Stat. 72. Many questions arose concerning the scope of "reserve funds required by law," and a number of decisions developed the issue. The result was a definition generally accepted as identifying *technical reserves*. See Helvering v. Oregon Mut. Life Ins. Co., 311 U.S. 267, 61 S.Ct. 207, 85 L.Ed. 180 (1940); Commissioner of Internal Revenue v. Monarch Life Ins. Co., 114 F.2d 314 (1st Cir. 1940). Under this definition it is clear that the scope of technical reserves was not such as to include amounts reserved to cover accrued but unpaid claims. At the same time, the decisions made it clear that technical reserves generally did include unaccrued claims.[6]

The District Court held that the scope of section 806 is limited to the concept of technical reserves. 250 F.Supp. at 136. As appellee puts it, "section 806 in title and in text refers to the unearned premiums and unpaid losses as 'reserves.' Reserves in the insurance sense mean technical reserves, and technical reserves cannot include accrued liabilities."[7] We

---

6. The court in *Monarch* stated the requirements for technical reserves to be as follows:
   "It must pertain directly to insurance and be calculated upon the basis of an experience or actuarial table applicable to the nature of the risk involved, with an interest assumption involved in the calculation. It must be set up and maintained out of premiums and earnings from the investment thereof, and be maintained for the purpose of maturing and liquidating, either by payment or reinsurance with other companies, future, unaccrued and contingent claims."

Commissioner v. Monarch Life Ins. Co., supra at 319.

7. Appellee has also made a terminological distinction between unaccrued losses for which a "reserve" must be kept and accrued claims for which a "fund" must be established for ultimate payment. This distinction is meaningless. Indeed, the original section 202(b) of the 1939 Code, ch. 2, 53 Stat. 71, spoke of "reserve funds," and it seems that the term "reserves" or "reserve funds" was derived from the word "fund" alone. 8 Mertens, Law of Federal Income Taxation § 44.27, at 68 n.1 (rev. ed. 1964).

cannot accept this view.[8] The concept of technical reserves was developed under the original provisions of the 1939 Code, as well as under the prior law, in connection with the scope of "reserve funds required by law."[9] See Commissioner v. Monarch Life Ins. Co., supra. This is much different from use of the term "reserves" in a general sense. See generally 8 Mertens, Law of Federal Income Taxation §§ 44.26–.30, at 66–87 (rev. ed. 1964). Furthermore, the later developments in the method of life insurance company taxation strengthen belief that this narrow interpretation is incorrect.

The Revenue Act of 1942 made significant changes in the taxation structure for life insurance companies, and these changes were generally reenacted in the original version of the 1954 Code. In the first place, Congress chose to treat noncancellable accident and health insurance contracts in the same manner as life insurance contracts, the reason being that these other noncancellable policies also require the accumulation of substantial reserves against increased future risks. More significantly, however, the 1942 Act added a definition of "life insurance reserves"[10] which substantially encompassed the concept of technical reserves developed under the prior law. This definition of life insurance reserves was incorporated into an expanded definition of a life insurance company, as follows:

"For purposes of this subtitle, the term 'life insurance company' means an insurance company which is engaged in the business of issuing life insurance and annuity contracts * * *, or noncancellable contracts of health and accident insurance, if its life insurance reserves * * * plus unearned premiums and unpaid losses on noncancellable life, health, or accident policies not included in life insurance reserves, comprise more than 50 percent of its total reserves. For purposes of this section, the term 'total reserves' means life insurance reserves, unearned premiums and unpaid losses not included in life insurance reserves, and all other insurance reserves required by law. * * *"

Int.Rev.Code of 1954, § 801, ch. 736, 68A Stat. 255 (formerly Int.Rev.Code of 1939, § 201(b), as amended, ch. 619, § 163(a), 56 Stat. 867 (1942)). It is in this section that "unpaid losses" first appears in the subchapter here involved. The parties agree that the term as used in this section should have the same meaning as it has in section 806. Although an examination of section 801 along these comparative lines is not required for a conclusion as to the meaning of "unpaid losses" in section 806, our interpretation

---

8. This same contention was also rejected by the Court of Claims in Prudential Ins. Co. of America v. United States, supra, 319 F.2d at 166.

9. The opinion of the District Court seems to suggest that the term "unpaid losses" was included in section 806 under the original version of the 1939 Code. 250 F.Supp. at 137. This, however, is incorrect. The term first appeared in this section in the Revenue Act of 1942, and the cases defining technical reserves were decided prior to this revision of the 1939 Code.

10. Int.Rev.Code of 1954, § 803(b), ch. 736, 68A Stat. 256 (formerly Int.Rev. Code of 1939, § 201(c) (2), as amended, ch. 619, § 163(a), 56 Stat. 868 (1942)), provided in part as follows:
"The term 'life insurance reserves' means amounts which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts * * * involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies. Such life insurance reserves, except in the case of policies covering life, health, and accident insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation and except as hereinafter provided in the case of assessment life insurance, must also be required by law. * * *"

of section 801 is nevertheless persuasive in support of the result which we reach.

The legislative history of the 1942 Act reveals that the definition of the term "life insurance reserves" in section 803(b), which was incorporated in section 801, was intended to encompass the previously developed scope of technical reserves. Even this definition of life insurance reserves, however, was expanded beyond the narrow scope of technical reserves alone, so that the definition also covered some noncontingent claims, none of which were included within technical reserves.[11] This broadening of coverage evidences Congressional intent not to restrict the new provisions to the previous narrow area. Indeed, the wiser interpretation of the 1942 revisions in regard to sections 801 and 803(b) would seem to be that Congress intended to eliminate the complex problems resulting from the technical reserves concept.

■ Moreover, the broadening effect of the 1942 amendments in this regard is even more apparent when it is seen that additional items were then, in 1942, added to "life insurance reserves" in section 801. In the House Report pertaining to this section, there appears: "The pro rata unearned premiums and the *total unpaid losses* on noncancelable health and accident policies are added to life insurance reserves in determining whether a company is to be considered a life insurance company." H. Rept. No. 2333, 77th Cong., 2d Sess. 109 (1942), 1942–2 Cum.Bull. 372, 454. (Emphasis added.) See S. Rept. No. 1631, 77th Cong., 2d Sess. 144 (1942), 1942–2 Cum. Bull. 504, 611. Since most, if not all, unaccrued unpaid loss claims would be included within the section 803(b) definition of life insurance reserves, and since even the section 803(b) definition included some non-technical reserves, we believe that "unpaid losses" were intended in section 801 to include all unpaid claims, both unaccrued and accrued. The language is clear, and the legislative history of the section supports this interpretation.[12]

Apart from this interpretation of section 801,[13] however, an examination

---

11. The Senate Report on this section includes the following:

"The definition [of 'life insurance reserves'] *is substantially that contained for many years in the regulations* with the addition that the reserves must be based on recognized mortality or morbidity tables, the health and accident reserves must be noncancelable, and unpaid loss reserves on such health and accident contracts are included if computed on a discount basis. * * * The elimination of contingent claims from the House bill is to permit the liability arising from insurance contracts providing for the payment of the proceeds in installments certain for a specified period and a continuation of their installment payments to a beneficiary so long as he might live, to be classified as a reserve if the contract involved a life contingency *even if some part of the liability was held to meet noncontingent claims.*"

S. Rept. No. 1631, 77th Cong., 2d Sess. 145 (1942), 1942–2 Cum.Bull. 504, 612. (Emphasis added.) Quite obviously, the accrued claims here in question would not fall within this definition.

12. The District Court concluded that this result "would certainly not be consistent with the obvious intent of the statute, for to so construe it would be to draw into the definition of life insurance companies other insurance companies which did not have adequate qualified reserves to make them taxable as life insurance companies, but would nevertheless come within the definition because of the addition of accrued liabilities to their technical reserves." 250 F.Supp. at 137. Since the section itself defines life insurance companies for the purposes of the subchapter, there is no reason why such "other insurance companies" should not be considered to be life insurance companies if they are within the scope of the section. Certainly it is clear that Congress intended to broaden the definition of a life insurance company under the new section. While contending for a different interpretation in this regard, appellee nevertheless represents in its brief that Congress "quite obviously * * * wanted to broaden the definition of a life insurance company" in 1942.

13. It should also be noted that the term "unpaid losses" appears elsewhere in the subchapter involved here. In section 832

of the other changes made by the Revenue Act of 1942, enacting the predecessor to section 806, and of the changes made by the Revenue Act of 1951, in which the method of application of section 806 was altered, demonstrates that Congress intended that "unpaid losses," as used in section 806, should include both unaccrued and accrued claims.

We have previously remarked that only a small percentage of the investment income of a life insurance company represents true income, since most of those receipts will eventually be returned to policy holders. This was originally allowed for by way of a deduction of a given percentage of the "mean of the reserve funds required by law." In 1942 this was changed to provide for a "reserve and other policy liability credit." Int.Rev.Code of 1939, § 203, as amended, ch. 619, § 163(a), 56 Stat. 870 (1942). That deduction was computed by multiplying the life insurance company's taxable income by a figure to be determined by the Secretary of the Treasury in accordance with a statutory formula. See Int.Rev.Code of 1954, § 804, ch. 736, 68A Stat. 258 (formerly Int.Rev.Code of 1939, § 202(b), as amended, ch. 619, § 163(a), 56 Stat. 870 (1942)). This figure was commonly called the "Secretary's ratio."

This deduction alone, however, would create a significant inequity. Cancellable insurance policies require the establish-

ment of unearned premiums and unpaid losses reserves, but they do not require the laying aside of a substantial part of the investment income for eventual return to the policy holders. Since a life insurance company was not required, for tax purposes, to segregate its income according to the sources of the reserve funds that produced the income, its deduction would be attributable in part, assuming it carried on such other business, to income earned on funds acquired through the sale of cancellable forms of insurance. In contrast, insurance companies which did not qualify as life insurance companies were not entitled to the reserve and other policy liability deduction. Therefore, a life insurance company also engaging in non-life business would receive a deduction of a portion of its income from that business, while a non-life insurance company engaging in non-life business identical to that carried on in part by the life company would not. The "adjustment for certain reserves" of section 806 was intended to remedy this inequity. The reports of the Congressional committees which studied this section prior to its enactment in 1942 make it evident that the purpose was to tax a life insurance company on the investment income from its cancellable insurance business, so that its burden would reasonably match those imposed on other types of insurance companies.[14] The specific form of this rem-

(b) (5) of the original 1954 Code provisions, ch. 736, 68A Stat. 265, relating to taxation of insurance companies other than life or mutual insurance companies, as well as in the corresponding sections of the 1939 Code, § 204(b) (6), ch. 2, 53 Stat. 73, and the Revenue Act of 1926, § 246(b) (6), ch. 27, 44 Stat. 49, the term appears in the definition of "losses incurred." In the computation of "losses incurred," which was a deduction from the underwriting income of insurance companies covered by this section, it was provided that the taxpayer had to include in a specified manner the amounts of "all unpaid losses outstanding at the end of the taxable year," as well as those outstanding at the end of the preceding taxable year. In this context "unpaid losses" was held to include accrued losses.

G.C.M. 2318, VI-2 Cum.Bull. 80 (1927); see Retailers Fire Ins. Co., 3 B.T.A. 1186 (1926). The context of the use of the term in section 832 is clearly distinguishable from that in section 806. Nevertheless, it is significant that prior to the Revenue Act of 1942 the term in question here had acquired, in this other context, a scope covering accrued claims.

14. The Senate Committee reported:
"Subsection (c) of section 202 (relating to adjustment for certain reserves) is new and changes section 201 (g) of the House bill to apply the adjustment for certain reserves to other cancelable contracts as well as cancelable health and accident contracts, and to add the adjustment to the tax base rather than to net income. Such addition to the tax base will offset the re-

edy was the section's requirement that life insurance companies return to their tax base an amount substantially equal to the amount of the reserve and other policy liability deduction attributable to income on funds traceable to non-life contracts.

Subsequent to the 1942 enactment of the predecessor to section 806, the method of application of the section was altered. The Revenue Act of 1951 eliminated use of the reserve and other policy liability credit for a one-year period,[15] and in its place, Congress lowered the tax rates applicable to life insurance companies so that, in effect, there was created an equivalent allowance for the necessary additions of investment income to reserves. Revenue Act of 1951, ch. 521, § 336(a), 65 Stat. 507. In order, however, to place the "adjustment for certain reserves" in line with these lowered tax rates, Congress also provided that life insurance company taxable income for 1951 should be the normal taxable income plus eight times the amount of the adjustment for certain reserves. Revenue Act of 1951, ch. 521, § 336(b), 65 Stat. 508. This multiplier of eight had the effect of equalizing, approximately, the lower tax rate on life insurance companies and the normal corporate tax rate [16] applied to non-life insurance companies doing cancellable insurance business. Int.Rev.Code of 1954, § 831, ch. 736, 68A Stat. 264. This tax structure of the 1951 Act was subsequently extended for further one-year periods and was reenacted in the 1954 Code for application to taxable years beginning in 1954. Int.Rev.Code of 1954, §§ 802(b) & 805(a), ch. 736, 68A Stat. 255–256, 258.

The District Court held that the inclusion of accrued liabilities in "unpaid losses" would result in double taxation, since the income attributable to those accrued liabilities received no benefit from the reserve and other policy

serve and other policy liability credit. Under existing law a life insurance company writing health or accident or other insurance contracts is taxable only on investment income and since there is very little investment income derived from the investment of premiums on such contracts, the real income from the accident and health and other business, which is derived from premiums, is not taxed. Similar contracts written by an insurance company subject to the tax imposed by section 204 are taxable on both investment and underwriting income from such contracts. The segregation of cancelable health and accident and other insurance business written by life insurance companies and making the income therefrom taxable under section 204 or 207, as the case may be, was considered. However, this was objected to on the ground that it would result in litigation because of the difficulty in determining the proper apportionment of items of expense and income properly allocable to such business and that the segregation for reports to State insurance commissioners is arbitrary and unsatisfactory.

"In order to provide a more easily determinable tax base for the cancelable health and accident and other business of life insurance companies, it is provided that interest on the unearned premiums and unpaid losses on cancelable health or accident or other business be included in the tax base as determined for life insurance companies. The interest on these reserves would be computed at 3¼ per cent, the average rate of interest that is allowed life insurance companies."

S. Rept. No. 1631, 77th Cong., 2d Sess. 148–49 (1942), 1942-2 Cum.Bull. 504, 614–15; see H. Rept. No. 2333, 77th Cong., 2d Sess. 111–12 (1942), 1942-2 Cum.Bull. 372, 455–56.

15. However, the provision for a "reserve and other policy liability credit" remained in the Code, since if no new legislation were to be enacted, the 1942 Act structure would again be applicable upon the lapse of the one-year period of effectiveness of the 1951 Act. This was also the case with the 1954 Code, in which the title of this provision was changed to the "reserve and other policy liability deduction." Int.Rev.Code of 1954, § 804, ch. 736, 68A Stat. 258.

16. The rates were 3¾ percent up to $200,000 and 6½ percent for any excess above that amount. Int.Rev.Code of 1954, § 802(b), ch. 736, 68A Stat. 255. Multiplied by eight, these equalled 30 percent and 52 percent respectively, which were the normal corporate rates for 1954. Int.Rev.Code of 1954, § 11.

liability deduction. "It is clear," the court wrote, "that in calculating the Reserve and Other Policy Liability Deduction, or its equivalent, allowed to life insurance companies, only technical reserves could be included, and a reserve and other liability deduction for accrued losses would not be allowed in the first place." 250 F.Supp. at 139. With this, the District Court's crucial premise, we disagree.[17]

As noted above, the 1921–1942 counterpart of the reserve and other policy liability deduction was expressed as a percentage of "reserve funds required by law." As applied to that statutory scheme, the district judge's observation would doubtless be valid. But in writing that the "reserve and other liability deduction for accrued losses would not be allowed," he misconceived, we think, the nature of the deduction as it existed at the relevant time. Under the structure established by the 1942 Act, the deduction was computed by multiplying the life insurance company's taxable income by the Secretary's ratio. Similarly, under the structure of the 1954 Code, the reduced tax rates were applied to the life insurance company's taxable income. Under both systems, it was clear that the investment income from any accrued claims accounts would be included in the company's taxable income, as would the investment income from other forms of reserves. Int.Rev.Code of 1954, §§ 803(a) (2) & (g), ch. 736, 68A Stat. 256–257 (formerly Int.Rev.Code of 1939, §§ 201(c) (1) & (7), as amended, ch. 619, § 163(a), 56 Stat. 868–869 (1942)).

It is seen, therefore, that taxable income derives from all of the company's invested funds. No assets of the company are withdrawn or rendered unproductive by the accrual of a liability. That accrual is no more than a bookkeeping exercise, a credit to a liability account and a corresponding debit to the reserve account for unaccrued liabilities. It is only when a liability is satisfied by payment that there is an actual withdrawal of assets. Until then, those assets continue to earn income which increases the taxable income of the life insurance company.[18] Under the applicable provisions, that income was then affected in toto by the reduced tax rates or by the reserve and other policy liability deduction. If the liability related to non-life business, the deduction attributable to income from those assets must be surrendered via the "adjustment for certain reserves," and that can be accomplished only if "unpaid losses" are construed to include accrued liabilities. The judgment of the District Court, insofar as it awarded taxpayer a refund based upon the challenged interpretation of section 806, must be reversed.

### FOREIGN TAX CREDITS

While expressing the opinion that "much can be said in defense of" the

---

17. It appears that a Nebraska district court has agreed with our conclusion in this regard. The court held as follows:
   "Plaintiff also contends that for the year 1954 its assets and income were subjected to an unlawful double taxation consisting of a tax imposed upon actual net investment income from all sources compounded with a tax upon a portion of the reserves other than life insurance reserves established by it. Plaintiff has not made a convincing showing regarding this contention, and we decide adversely thereto."
   United Benefit Life Ins. Co. v. McCrory, 242 F.Supp. 845, 850 (D. Neb. 1965).

18. This fact may readily be seen if it is assumed *arguendo* that money is actually transferred to a separate account for accrued liabilities. Such a fund would generate a constant flow of investment income, since as part of the funds were withdrawn for payment, other funds would be added as other liabilities accrued. As appellant has explained, "an ongoing enterprise will satisfy its liabilities from current receipts without affecting investment. * * * Insurance reserves, of course, change from day-to-day and month-to-month, but, on the whole, the changes balance with one another and the flow of income offsets expenditures." Thus, if a separate fund for accrued liabilities were in fact established, the insurance company would nevertheless be able to maintain investment of a large part of that fund's assets for income production.

taxpayer's contention that the Canadian taxes in question are income taxes within the meaning of section 901, the District Court expressly refused to base its decision upon that ground. 250 F.Supp. at 132. Instead, the court ruled that those taxes constituted taxes paid in lieu of income taxes otherwise generally imposed. Appellee has renewed the initial contention before us, but we do not believe that it can be sustained. Cf. Northwestern Mut. Fire Ass'n v. Commissioner of Internal Revenue, 181 F.2d 133 (9th Cir. 1950); Keasbey & Mattison Co. v. Rothensies, 133 F.2d 894 (3d Cir. 1943), cert. denied, 320 U.S. 739, 64 S.Ct. 39, 88 L.Ed. 438 (1943).

The determinative question, therefore, is whether it can fairly be said that the particular premiums taxes involved here constituted a substitute for a generally levied income tax which otherwise would have been imposed upon the taxpayer by the foreign governments. Since the immediate problem involves a stock life insurance company operating in Canada, it appears to be one of first impression. Four Court of Claims decisions have held that the Dominion and Quebec premiums taxes in question meet the requirements of the "in lieu of" provision so as to allow credit to *mutual* life insurance companies. Metropolitan Life Ins. Co. v. United States, Ct.Cl., 375 F.2d 835 (1967); Equitable Life Assur. Soc'y v. United States, 177 Ct.Cl. 55, 366 F.2d 967 (1966),

cert. denied, 386 U.S. 1021, 87 S.Ct. 1375, 18 L.Ed.2d 457 (1967); Prudential Ins. Co. of America v. United States, 167 Ct. Cl. 598, 337 F.2d 651 (1964), cert. denied, 386 U.S. 1018, 87 S.Ct. 1375, 18 L.Ed.2d 457 (1967); Prudential Ins. Co. of America v. United States, 162 Ct.Cl. 55, 319 F.2d 161 (1963). Furthermore, credits for premiums taxes collected under an earlier Dominion statute have been allowed to a mutual fire insurance company by our court. Northwestern Mut. Fire Ass'n v. Commissioner of Internal Revenue, supra. However, although there are some variations in the taxation of these various types of companies, the Government confesses, "we frankly see no adequate foundation for attempting to distinguish the Court of Claims decisions." We agree that no distinction should be made, and it follows that the result here should be the same as that reached in the above mentioned cases.

The Government contends that section 903 contemplates only those taxes imposed because the levying of a conventional income tax would be "administratively difficult" and that only "empirical income taxes" should be held to fall within the "in lieu of" provision. The source of this argument is the example contained in the Treasury Regulations relating to section 903 and to it predecessor under the 1939 Code.[19] The contention has been expressly rejected by the

19. "The A Corporation does business in X country, which imposes an income tax upon substantially a taxable income base. The ascertainment of taxable income, though not the determination of gross income, from sources in X country is found administratively difficult. The X country, by decree, provides that corporations circumstanced as was the A Corporation would, in lieu of the income tax at the rate of 20 percent otherwise payable, be subject to tax at the rate of 10 percent upon the amount of gross income from X country. In accordance with such decree the A Corporation paid X country the sum of $25,000 in 1955 with respect to its tax liability to the X country for the year 1954. Such amount, subject to the applicable limitations, is available as a

credit to the A Corporation as foreign income, war profits, or excess profits taxes against the United States tax liability for the year 1954." Treas.Reg. § 1.903–1(b) (1957). A substantially identical illustration was contained in the Regulations pertaining to the 1939 Code. Treas.Reg. § 39.131(h)– 1(b), T.D. 5226, 1943 Cum.Bull. 375, 381 (formerly Treas.Reg. 111, § 29.131–2, and Treas.Reg. 103, § 19.131–2). The time of allowability as a credit indicated in the quoted illustration assumes that A Corporation is an accrual basis taxpayer. In that respect it does not accurately reflect the situation before us, for the taxpayer in the instant case reports its income on the cash basis. Specifically, this appeal involves the taxable years 1954 and 1955. Credit is sought for Canadian

Court of Claims. Metropolitan Life Ins. Co. v. United States, supra, 375 F.2d at 837–839. It is not necessary, however, to decide whether Congress intended that section 903 be so limited, for the premiums taxes in question do fall within appellant's conception of "empirical income taxes" and are analogous to those involved in the illustration presented in the Regulations. This conclusion is supported by reference to that method of taxing life insurance companies which was employed by the United States during the taxable years in question. As noted in the first portion of this opinion, the relevant tax rates were applied to a sum representing, essentially, the amount of income earned from investment of the company's funds. The main sources of such funds were the company's premiums recepits. By taking a flat two percent of the net premiums attributable to Canadian insurance contracts, the Canadian taxing authorities may well have been approximating the amount of tax revenue which would be derived if they were to determine the actual income earned on the investment of such premiums and then apply to that amount their normal corporate income tax rates. Selection of such a method would in no way be unreasonable, since a nonresident company, such as appellee, would likely invest the premiums derived from its Canadian contracts outside that country, thus rendering burdensome, or "administratively difficult," the task of ascertaining the income from those investments.[20]

For the taxable years in question, section 6 of the Quebec Corporation Tax Act, Statutes of Quebec, 11 Geo. 6, c. 33, § 6 (1947), imposed a seven-percent income tax upon "every company, partnership or person contemplated by subdivisions 1, 4, 5, 6, 7, 8, 11, 13, 14, 15, 16, 17, 18 and 19 of section 3 * * *." Appellant concedes that this seven-percent levy was an income tax for which credit under section 901 of the 1954 Code would be allowable. Subdivision 1 of section 3, referred to in the quoted portion of the Quebec income tax statute, encompassed "every incorporated company carrying on any undertaking, trade or business *which is not otherwise specially taxed* under the following subdivisions of this section 3 * * *." Corporation Tax Act, Statutes of Quebec, 11 Geo. 6, c. 33, § 3(1) (1947). (Emphasis added.) One of these "following subdivisions of this section 3," specifically subdivision 3, levied upon the taxpayer the two-percent premiums tax in issue. Therefore, under the clear, unambiguous terms of the Quebec statutes, appellee was not subject to the income tax only because it was required to pay the premiums tax. Thus, it is manifest that the Quebec premiums tax was, in respect to this taxpayer, in lieu of an income tax "otherwise generally imposed."[21]

Whether the net premiums tax paid to the Dominion of Canada should be allowable under the foreign tax credit provision presents a more complex problem. Canada did, at the relevant time,

---

taxes levied in and applicable to 1953 and 1954, which taxes were not paid by the taxpayer until the following years.

20. Additionally, it is unlikely that funds derived from premiums on Canadian contracts would be segregated, for purposes of investment, from funds derived from premiums on non-Canadian contracts.

21. As noted previously, this determination harmonizes with the four decisions of the Court of Claims. It is also in accord, we believe, with the Regulations promulgated by the Commissioner. The applicable Regulation provides that a foreign tax qualifies as an "in lieu of" tax if (1) the

foreign country has in force a general income tax law, (2) the taxpayer claiming credit would, in the absence of a specific provision applicable to it, be subject to the general income tax, and (3) the general income tax is not imposed on the taxpayer thus subject to the substituted tax. Treas.Reg. § 1.903–1(a) (1957). Regulations under the comparable section of the Internal Revenue Code of 1939. § 131(h), as amended, ch. 619, § 158(f), 56 Stat. 858 (1942), were virtually identical. Treas.Reg. § 39.131(h)–1(a), T.D. 5226, 1943 Cum.Bull. 375, 380 (formerly Treas. Reg. 111, § 29.131–2, and Treas.Reg. 103, § 19.131–2).

have a generally imposed income tax applicable both to residents and, insofar as they had taxable income earned in Canada, to nonresidents. Income Tax Act, Can.Rev.Stat. c. 148, § 2 (1952). Section 30 of the Act, Can.Rev.Stat. c. 148, § 30 (1952), provided in part as follows: "Notwithstanding anything in this Part, the taxable income of a life insurance corporation for a taxation year is the aggregate of the amounts credited to shareholders' account or otherwise appropriated for or on account of shareholders during the year * * *." Appellee, however, paid no tax pursuant to this section. This was due, the parties agree, to the fact that nonresident stock life insurance companies were "deemed not to have a shareholders' account in Canada" by the Dominion's tax authorities. This exemption from the income tax, coupled with the imposition of a premiums tax which, as we have seen, can be viewed as an "empirical income tax," very strongly points to the conclusion that the latter was imposed "in lieu of" the former.

The picture is clouded by the fact that Canadian *resident* stock life insurance companies apparently pay *both* taxes.[22] In that circumstance, the Government argues that the premiums tax cannot qualify as an "in lieu of" tax. This same argument has been specifically rejected by the Court of Claims in the case of a mutual life insurance company. Metropolitan Life Ins. Co. v. United States, supra, 375 F.2d at 840–841. In so holding, the Court of Claims noted that its decision was limited in scope to mutual life companies; however, our consideration of the Dominion tax structure[23] convinces us that the result should be the same for a stock life insurance company.

Section 2 of the Canadian Income Tax Act expresses clear legislative intent to impose a tax on income earned in Canada by nonresidents. We cannot assume that the Dominion chose to forego the opportunity to tap the revenue source offered by nonresident stock life insurance companies doing business within her boundaries. The fact that these companies were "deemed" not to be taxable under section 30 of the Act does not indicate such a choice, for the method of ascertaining taxable income prescribed by that section would not provide a precise measure of business done in Canada. The net premiums tax, on the other hand, measures precisely the volume of business carried on in the Dominion and provides, as we have seen, an indirect measure of the amount of income generated by that business. Whatever the function of the Dominion premiums tax might be in relation to resident stock life insurance companies, when paid by a nonresident stock life company it must be regarded, for purposes of the foreign tax credit, as a tax paid in lieu of a foreign income tax otherwise generally imposed.

Affirmed in part; reversed in part.

---

22. The premiums tax is imposed by section 4(1) of the Excise Tax Act, Can.Rev. Stat. c. 100, § 4(1) (1952), upon "every company authorized under the laws of Canada or of any province thereof to transact the business of insurance * * *."

The taxpayer asserts that this problem exists only in theory. In practice, it says, even resident life insurance companies are exempt from the Dominion income tax because the directors of such companies may choose not to credit anything to the shareholders' account in any given year. We doubt the soundness of this contention. While the directors of the corporation may enjoy discretion in dividend distribution of profits, may they ordinarily avoid crediting the corporation's profits to some type of shareholders' account in the balance sheet? We think not. In our opinion, such crediting is all that section 30 contemplates as an indicator of taxable income.

23. Attempting to support their respective positions, both parties have referred us to certain Canadian legislative history. We have found it to be inconclusive on the issues before us. For a discussion of much of this history, see Equitable Life Assur. Soc'y v. United States, supra.