**FIRST RAILROAD & BANKING COMPANY OF GEORGIA,**
Plaintiff-Appellee,

v.

**UNITED STATES of America,**
Defendant-Appellant.

No. 73–3184.

United States Court of Appeals,
Fifth Circuit.

June 11, 1975.

Rehearing and Rehearing En Banc
Denied Oct. 8, 1975.

Scott P. Crampton, Asst. Atty. Gen., Fred Luyties, Atty., Meyer Rothwacks, Tax Div., Dept. of Justice, Washington, D. C., Edmund A. Booth, Jr., Asst. U. S. Atty., R. Jackson B. Smith, Jr., U. S. Atty., Augusta, Ga., Bennet N. Hollander, Murray S. Horwitz, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

James R. Harper, Atlanta, Ga., for plaintiff-appellee.

Appeal from the United States District Court for the Southern District of Georgia.

Before BROWN, Chief Judge, and GODBOLD and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The Government appeals from a judgment granting First R.R. & Banking Company of Georgia's (taxpayer's) prayer for recovery of a deficiency assessment, paid for the years 1961 through 1964. It is argued the District Court erroneously held taxpayer was entitled to exclude the income of a sub-subsidiary, First of Georgia Life Insurance

Company (Insurer)[1] from its consolidated return. Sections 801 and 1504(b)(2).[2] We agree and reverse.

Both on appeal and in the District Court, the Government challenges Insurer's ability to satisfy the 50% reserve ratio test of § 801.[3] The success of the challenge depends upon whether a Reinsurance Treaty between Insurer and Reinsurer effectively transferred a substantial block of non-qualifying[4] accident and health (A&H) insurance reserves from Insurer to Reinsurer, thereby raising the proportion of life insurance reserves above the 50% level.

Reinsurer desired to enter the credit[5] life and A&H business. Georgia law requires an insurance company writing such policies to qualify as a life insurance company. Insurer was organized for the purpose of qualifying, because Reinsurer could not.

Insurer was capitalized with $400,000. Georgia requires that insurers maintain cash reserves to cover payment of potential insurance liabilities. These reserves must equal the total "unearned premium".[6] Assets exceeding reserves are "surplus", and Georgia insurance officials measure a company's solvency by comparing surplus to reserves. The record shows that Georgia permits reserves to reach a level one and a half to two times surplus.

In Insurer's case, this limit was approached rather quickly because of a "provisional commission" arrangement with its agents. Under the arrangement, each agent initially retained 50% of all premiums collected—but Insurer was nevertheless required to maintain reserves equal to 100% of the policy-premiums. As Insurer wanted to undertake a greater volume of business, it entered into the Reinsurance Treaty with Reinsurer, its parent.

1. A wholly-owned subsidiary of First of Georgia Insurance Company (Reinsurer). Parent-taxpayer, in turn, owns 100% of Reinsurer.

2. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise specified.

3. Sec. 801. (a) *Life insurance company defined.*—For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

    (1) its life insurance reserves (as defined in subsection (b)), plus

    (2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c)).

    (b) *Life insurance reserves defined.*—

    (1) *In general.*—For purposes of this part, the term "life insurance reserves" means amounts—

    (A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

    (B) which are set aside to mature or liquidate, either by payment or reinsurance,

future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

    \*    \*    \*    \*    \*    \*

    (c) *Total reserves defined.*—For purposes of subsection (a), the term "total reserves" means—

    (1) life insurance reserves,

    (2) unearned premiums, and unpaid losses (whether or not ascertained), not included in life insurance reserves, and

    (3) all other insurance reserves required by law.

The term "total reserves" does not include deficiency reserves (within the meaning of subsection (b)(4)).

4. Not "noncancellable" for § 801(a)(2) purposes.

5. Credit insurance is a form of credit-consumer protection which guarantees payments on the subject debt in the event of the borrower's death or disability.

6. Credit insurance is generally 100% prepaid—as the loans' durations are generally short. The premium is "earned" by providing insurance coverage—thus the reserve required for each policy decreases as its term passes.

Basically, the Treaty provided that 60%[7] of Insurer's A&H policies (i.e., 60% of each policy) was reinsured by Reinsurer—but none of the life policies. Insurer was then entitled, under Georgia law, to continue writing insurance, because the corresponding A&H reserves shifted to Reinsurer, while Insurer's surplus remained the same.

But non-basically, the true nature of the Reinsurance Treaty can only be seen when the commission arrangement is detailed. Reinsurer agreed to pay Insurer a 96% commission on all business the Reinsurer received under the Treaty. The commission was payable, however, only at the end of the coverage period— and then only after "adjustment". And the adjustment was a dollar-for-dollar deduction of any loss (paid-out claim) experienced under the policies. Further, if the claim-loss exceeded the premium on that particular policy, Reinsurer was further entitled to set-off the excess against commissions payable on policies against which no claims had been asserted. And still further, if the claim-loss for any accounting period exceeded commission payable for that period, the excess could be carried forward, and set-off against succeeding commission payments.

■ In short, the economic substance of the arrangement was that as between taxpayer's issue, Insurer suffered or enjoyed fate's capricious precipitation of policy-claims, while the Reinsurer, for a 4% fee, provided in effect a line of credit in case periodic claims reached abnormal-

ly high levels. And since the record shows that claim-losses over time averaged only about 22% of total premiums received there was no likelihood that Reinsurer as an economic matter would ever sustain any losses. Reinsurer under the arrangement did not bear any risks except the outside possibility of insolvency of Insurer.[8] We hold therefore there was no substance to the agreement as reinsurance.

■ We in no way denigrate the salutary holding of Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, that taxpayers are free to arrange their affairs in a way which entitles them to tax advantages. Nor do we question the validity of everyone's business reasons for establishing this Treaty arrangement—indeed we have carefully explained it, *ante*. But the issue is not whether the Treaty will be recognized for tax purposes *vel non*, but *given* the Treaty, what are its tax consequences and that depends on whether it really amounts to reinsurance as contemplated in the Act.

■ The Seventh Circuit recently considered this credit-insurance reinsurance reserve problem.[9] But they did not reserve the question—they considered very carefully the legislative history of § 801. They concluded that Congress intended by that section to charge the company *actually* experiencing the risk of claim losses with the corresponding "reserves" —for the purpose of determining who

---

7. The Treaty was later renegotiated for the purpose of ceding 70% of the A&H business. However, this amendment is irrelevant to any of the substantive issues under consideration.

8. As the District Court put it:

Thus, assuming solvency of Georgia Credit Life, Georgia Insurance would eventually recapture all losses incurred by reason of its assumption of the quota share liability. Therefore, the risk of loss upon Georgia Insurance was, in actuality, remote. In order for it to sustain permanent out of pocket losses on liability under the subject policies, there would have to be valid claims exceeding 96% of the reinsurer's earned premium; and additionally, Georgia Credit Life would

have to be insolvent so as to preclude recapture of those losses in subsequent accounting periods.

Despite this transfer of minimal risk under the Reinsurance Treaty, there were substantial non-tax purposes for entering into the arrangement.

App. 249–50.

The fact that the state insurance authorities permitted the "reserves" to be handled as done by Insurer and Reinsurer cannot overcome these economic realities.

9. Economy Finance Corp. v. United States, 7 Cir., 1974, 501 F.2d 466, cert. denied, 1975, —— U.S. ——, 95 S.Ct. 1328, 43 L.Ed.2d 425.

was in the insurance business—as opposed to the loan business.[10]

We have examined the Seventh Circuit's rationale—as well as Judge Stevens' dissent and the various post-argument papers submitted by all the parties in our case. We think the majority's is the sounder approach—relying as it does on underlying Congressional intent and an analysis of the arrangement in the light of practical realities. We accept its reasoning and result.[11]

Reversed.

RONEY, Circuit Judge (dissenting):

I respectfully dissent for the reasons set forth in Judge Alaimo's opinion in this case, and in Judge Steven's dissent in Economy Finance Corp. v. United States, 501 F.2d 466 (7th Cir. 1974), cert. denied, —— U.S. ——, 95 S.Ct. 1328, 43 L.Ed.2d 425 (1975). Had Congress desired to define a life insurance company in terms of the ultimate risk, it could have easily done so. The judicial overlay to that effect is an unnecessary intrusion into the legislative process. Reserves being the lodestar, they should control. Although the majority holds there was no substance to the reinsurance agreement, without even a bow to the clearly erroneous rule, the district court having found factually to the contrary, there was certainly legal substance. The reinsurer was required to commit its assets to reserve status for insurance purposes and to pay tax on the reserve income for tax purposes. It bore all of the legal consequences of required reserves, the reinsured none. This decision throws confusion into a statutory enactment that deserves simpler application.

10. Here, the taxpayers admittedly sought surplus aid but they also desired to function as the insurer on these H&A policies . .. As a result, the reinsurance treaties served an interim loan function but did not serve to spread the insurance risk.

*Id.* at 477.

11. Our result is also supported by Consumer Life Ins. Co. v. United States, Ct.Cl., Dec. 13, 1974, 75–2 U.S.T.C. ¶ 9113, —— A.F.T.R.2d —— —although that Court employed a somewhat different rationale. And we are not unaware

of Penn Security Life Ins. Co. v. United States, Ct.Cl., 1973, 7 CCH 1973 Stand.Fed.Tax Rep. ¶ 7908. Each case is a Trial Judge's opinion— and currently under review by the en banc court. However, we point out in passing that (i) the *Consumer Life* opinion questioned the completeness of the factual record in *Penn Security*, and (ii) *Penn Security* relied in large part on Economy Finance Corp. v. United States, S.D.Ind., 1972, 72–2 U.S.T.C. ⸿ 9634, 30 A.F.T.R.2d 72–5446, which, of course, since has been reversed in the opinion we approve.