# UNITED STATES *v.* CONSUMER LIFE INSURANCE CO.

No. 75–1221.   Argued December 6, 1976—Decided April 26, 1977*

---

*Together with No. 75–1260, *First Railroad & Banking Company of Georgia* v. *United States,* on certiorari to the United States Court of Appeals for the Fifth Circuit, and No. 75–1285, *United States* v. *Penn Security Life Insurance Co.,* also on certiorari to the United States Court of Claims.

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, Blackmun, Rehnquist, and Stevens, JJ., joined. White, J., filed a dissenting opinion, in which Marshall, J., joined, *post*, p. 753.

*Stuart A. Smith* argued the cause for the United States in all cases. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Crampton, Acting Assistant Attorney General Baum, Ernest J. Brown,* and *Herbert Grossman. James R. Harper* argued the cause for petitioner in No. 75–1260. With him on the brief was *Irving R. M. Panzer.*

*E. Michael Masinter* argued the cause for respondent in No. 75–1221. With him on the brief was *James H. Landon. John B. Jones, Jr.,* argued the cause for respondent in No. 75–1285. With him on the brief were *John T. Sapienza, Andrew W. Singer, Owen T. Armstrong,* and *Robert A. Kagan.*

MR. JUSTICE POWELL delivered the opinion of the Court.

The question for decision is how unearned premium reserves for accident and health (A&H) insurance policies should be allocated between a primary insurer and a reinsurer for federal tax purposes. We granted certiorari in these three cases to resolve a conflict between the Circuits and the Court of Claims. 425 U. S. 990 (1976).

I

An insurance company is considered a life insurance company under the Internal Revenue Code if its life insurance reserves constitute more than 50% of its total reserves, IRC of 1954, § 801 (a), 26 U. S. C. § 801 (a),[1] and qualifying com-

---

[1] Section 801 (a) provides:

"(a) Life insurance company defined.

"For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

"(1) its life insurance reserves (as defined in subsection (b)), plus

"(2) unearned premiums, and unpaid losses (whether or not ascer-

panies are accorded preferential tax treatment.[2] A company close to the 50% line will ordinarily achieve substantial tax savings if it can increase its life insurance reserves or decrease nonlife reserves so as to come within the statutory definition.

The taxpayers here are insurance companies that assumed both life insurance risks and A&H—nonlife—risks. The dispute in these cases is over the computation for tax purposes of nonlife reserves. The taxpayers contend that by virtue of certain reinsurance agreements—or treaties, to use the term commonly accepted in the insurance industry—they have maintained nonlife reserves below the 50% level. The Government argues that the reinsurance agreements do not have that effect, that the taxpayers fail to meet the 50% test, and that accordingly they do not qualify for preferential treatment.[3]

---

tained), on noncancellable life, health, or accident policies not included in life insurance reserves,

"comprise more than 50 percent of its total reserves (as defined in subsection (c))."

As may be seen, the statement in the text is somewhat oversimplified. Reserves for noncancellable life, health, or accident policies are added to life insurance reserves for purposes of computing the ratio. See generally *Alinco Life Ins. Co.* v. *United States*, 178 Ct. Cl. 813, 831–847, 373 F. 2d 336, 345–355 (1967). Since none of these cases, as they reach us, involves any issue concerning noncancellable policies, we may ignore this factor.

Statutory citations, unless otherwise indicated, are to the Internal Revenue Code of 1954.

[2] The major benefit is that only 50% of underwriting income is taxed in the year of receipt, the balance being taxed only when made available to stockholders. The scheme for taxing life insurance companies is described in *United States* v. *Atlas Life Ins. Co.*, 381 U. S. 233 (1965), and *Jefferson Standard Life Ins. Co.* v. *United States*, 408 F. 2d 842, 844–846 (CA4), cert. denied, 396 U. S. 828 (1969).

Stock companies that fail to qualify as life insurance companies are taxed under the less favorable provisions of § 831. Most mutual insurance companies other than life are taxed under § 821, a section not implicated here since taxpayers are all stock companies.

[3] In two of the cases, the Court of Claims held for the taxpayer. *Con-*

Specifically the dispute is over the unearned premium reserve, the basic insurance reserve in the casualty insurance business and an important component of "total reserves," as that term is defined in § 801 (c).[4] A&H policies of the type involved here generally are written for a two- or three-year term. Since policyholders typically pay the full premium in advance, the premium is wholly "unearned" when the primary insurer initially receives it. See Rev. Rul. 61–167, 1961–2 Cum. Bull. 130, 132. The insurer's corresponding liability can be discharged in one of several ways: granting future protection by promising to pay future claims; reinsuring the risk with a solvent reinsurer; or returning a pro rata portion of the premium in the event of cancellation. Each method of discharging the liability may cost money. The insurer thus establishes on the liability side of its accounts a reserve, as a device to help assure that the company will have the assets necessary to meet its future responsibilities. See O. Dickerson, Health Insurance 604–605 (3d ed. 1968) (hereafter Dickerson). Standard accounting practice in the casualty field, made mandatory by all state regulatory authorities, calls

---

*sumer Life Ins. Co.* v. *United States,* 207 Ct. Cl. 638, 524 F. 2d 1167 (1975); *Penn Security Life Ins. Co.* v. *United States,* 207 Ct. Cl. 594, 524 F. 2d 1155 (1975). In the third case, the Court of Appeals for the Fifth Circuit ruled in favor of the Government. *First Railroad & Banking Co. of Georgia* v. *United States,* 514 F. 2d 675 (1975). It relied on an earlier holding to the same effect in *Economy Finance Corp.* v. *United States,* 501 F. 2d 466 (CA7 1974), cert. denied, 420 U. S. 947, rehearing denied, 421 U. S. 922 (1975), motion for leave to file second petition for rehearing pending, No. 74–701.

[4] Section 801 (c) provides in relevant part:

"(c) Total reserves defined.

"For purposes of subsection (a), the term 'total reserves' means—

"(1) life insurance reserves,

"(2) unearned premiums, and unpaid losses (whether or not ascertained), not included in life insurance reserves, and

"(3) all other insurance reserves required by law."

"Life insurance reserves" is defined in § 801 (b).

for reserves equal to the gross unearned portion of the premium.[5] A simplified example may be useful: A policyholder takes out a three-year A&H policy for a premium, paid in advance, of $360. At first the total $360 is unearned, and the insurer's books record an unearned premium reserve in the full amount of $360. At the end of the first month, one thirty-sixth of the term has elapsed, and $10 of the premium has become "earned."[6] The unearned premium reserve may be reduced to $350. Another $10 reduction is permitted at the end of the second month, and so on.

## II

The reinsurance treaties at issue here assumed two basic forms.[7] Under the first form, Treaty I, the taxpayer served as reinsurer, and the "other party" was the primary insurer or "ceding company," in that it ceded part or all of its risk to the taxpayer. Under the second form, Treaty II, the taxpayer served as the primary insurer and ceded a portion of the business to the "other party," that party being the reinsurer. Both types of treaties provided that the other party

---

[5] See Treas. Reg. § 1.801–3 (e) (1960) (defining unearned premiums), explained in Rev. Rul. 69–270, 1969–1 Cum. Bull. 185; *Utah Home Fire Ins. Co.* v. *Commissioner,* 64 F. 2d 763 (CA10), cert. denied, 290 U. S. 679 (1933); nn. 16 and 20, *infra.* See generally *Massachusetts Protective Assn.* v. *United States,* 114 F. 2d 304 (CA1 1940); *Commissioner* v. *Monarch Life Ins. Co.,* 114 F. 2d 314 (CA1 1940).

[6] This figure is derived from a straight-line or pro rata method of computing earned premiums. Some companies use a sum-of-the-digits method known as the Rule of 78, described in detail by the Court of Claims in the *Penn Security* case, No. 75–1285, Pet. for Cert. 34a–36a (Findings of Fact Nos. 10, 11). The difference in computation methods is not material for present purposes.

[7] Each was an indemnity reinsurance treaty, obligating the reinsurer to reimburse the ceding company for its share of losses. Such treaties constitute contracts between the companies only; the policyholders are not involved and usually remain unaware that part or all of the risk has been reinsured.

would hold the premium dollars derived from A&H business until such time as the premiums were earned—that is, attributable to the insurance protection provided during the portion of the policy term that already had elapsed. The other party also set up on its books the corresponding unearned premium reserve, relieving the taxpayer of that requirement. In each case, the taxpayer and the other party reported their affairs annually in this fashion to both the Internal Revenue Service and the appropriate state insurance departments. These annual statements were accepted by the state authorities without criticism. Despite this acceptance, the Government argues here that the unearned premium reserves must be allocated or attributed for tax purposes from the other parties, as identified above, to the taxpayers,[8] thereby disqualifying each of the taxpayers from preferential treatment.

## A

No. 75–1221, *United States* v. *Consumer Life Ins. Co.* In 1957 Southern Discount Corp. was operating a successful consumer finance business. Its borrowers, as a means of assuring payment of their obligations in the event of death or disability, typically purchased term life insurance and term A&H insurance at the time they obtained their loans. This insurance—commonly known as credit life and credit A&H—is usually coextensive in term and coverage with the term and amount of the loan. The premiums are generally paid in full

---

[8] The Government makes this attribution not under the familiar allocation rules of §§ 269 and 482, but rather based primarily on its interpretation of § 801 (c). Indeed, the former sections could not apply except in No. 75–1260, the *First Railroad* case, for only that case involves a reinsurance agreement between corporations controlled by the same interests. The Government invokes neither section here, though it has on occasion attempted to use both in its efforts to impose higher taxes on companies engaged in the credit life insurance business. See *Commissioner* v. *First Security Bank of Utah*, 405 U. S. 394 (1972) (§ 482); *Alinco Life Ins. Co.* v. *United States*, 178 Ct. Cl., at 822–830, 373 F. 2d, at 340–345 (§ 269).

at the commencement of coverage, the loan term ordinarily running for two or three years. Prohibited from operating in Georgia as an insurer itself, Southern served as a sales agent for American Bankers Life Insurance Co., receiving in return a sizable commission for its services.

With a view to participating as an underwriter and not simply as agent in this profitable credit insurance business, Southern formed Consumer Life Insurance Co., the taxpayer here, as a wholly owned subsidiary incorporated in Arizona, the State with the lowest capital requirements for insurance companies. Although Consumer Life's low capital precluded it from serving as a primary insurer under Georgia law, it was nonetheless permitted to reinsure the business of companies admitted in Georgia.

Consumer Life therefore negotiated the first of two reinsurance treaties with American Bankers. Under Treaty I, Consumer Life served as reinsurer and American Bankers as the primary insurer or ceding company. Consumer Life assumed 100% of the risks on credit life and credit A&H business originating with Southern, agreeing to reimburse American Bankers for all losses as they were incurred. In return Consumer Life was paid a premium equivalent to 87½% of the premiums received by American Bankers.[9] But the mode of payment differed as between life and A&H policies. With respect to life insurance policies, American Bankers each month remitted to the reinsurer—Consumer Life—the stated percentage of all life insurance premiums *collected* during the prior month. With respect to A&H coverage, however, American Bankers each month remitted the stated percentage of the A&H premiums *earned* during the prior month, the remainder to be paid on a pro rata basis over the balance of the coverage period.

Again an example might prove helpful. Assume that a

---

[9] Consumer Life's premium was later increased to 90½%.

policyholder buys from American Bankers on January 1 a three-year credit life policy and a three-year credit A&H policy, paying on that date a $360 premium for each policy. On February 1, under Treaty I, American Bankers would be obligated to pay Consumer Life 87½% of $360 for reinsurance of life risks. This represents the total life reinsurance premium; there would be no further payments for life reinsurance. But for A&H reinsurance, American Bankers would remit on February 1 only the stated percentage of $10, since only $10 would have been earned during the prior month. It would remit the same amount on March 1 for A&H coverage provided during February, and so on for a total of 36 months.

Treaty I permitted either party to terminate the agreement upon 30 days' notice. But termination was to be prospective; reinsurance coverage would continue on the same terms until the policy expiration date for all policies already executed. This is known as a "runoff provision."

Because it held the unearned A&H premium dollars, and also under an express provision in Treaty I, American Bankers set up an unearned premium reserve equivalent to the full value of the premiums. Meantime Consumer Life, holding no unearned premium dollars, established on its books no unearned premium reserve for A&H business.[10]  Annual statements filed with the state regulatory authorities in Arizona and Georgia reflected this treatment of reserves, and the statements were accepted without challenge or disapproval.

By 1962 Consumer Life had accumulated sufficient surplus to qualify under Georgia law as a primary insurer. Treaty I was terminated, and Southern began placing its credit insurance business directly with Consumer Life. The parties then negotiated Treaty II, under which American Bankers served as reinsurer of the A&H policies issued by Consumer

---

[10] Consumer Life did set up the full tabular reserve for the life insurance policies. See n. 20, infra.

Life.[11]   Ultimately Consumer Life retained the lion's share of the risk, but Treaty II was set up in such a way that American Bankers held the premium dollars until they were earned. This required rather complicated contractual provisions, since Consumer Life as primary insurer did receive the A&H premium dollars initially.

Roughly described, Treaty II provided as follows: Consumer Life paid over the A&H premiums when they were received.   American Bankers immediately returned 50% of this sum as a ceding commission meant to cover Consumer Life's initial expenses.   Then, at the end of each quarter, American Bankers paid to Consumer Life "experience refunds" based on claims experience.   If there were no claims, American Bankers would refund 47% of the total *earned* premiums.   If there were claims (and naturally there always were), Consumer Life received 47% less the sums paid to meet claims.   It is apparent that American Bankers would never retain more than 3% of the total earned premiums for the quarter.   Only if claims exceeded 47% would this 3% be encroached, but even in that event Treaty II permitted American Bankers to recoup its losses by reducing the experience refund in later quarters.   Actual claims experience never approached the 47% level.

Again, since American Bankers held the unearned premiums, it set up the unearned premium reserve on its books. Consumer Life, which initially had set up such a reserve at the time it received the premiums, took credit against them for the reserve held by American Bankers.   Annual statements filed by both companies consistently reflected this treatment of reserves under Treaty II, and at no time did state authorities take exception.[12]

---

[11] Under Treaty II the life business was not reinsured; Consumer Life, by itself, assumed the full liability.

[12] In addition to reviewing reports filed on prescribed forms, state regulatory authorities conduct regular triennial examinations of insurance

The taxable years 1958 through 1960, and 1962 through 1964, are at issue here. For each of those years Consumer Life computed its § 801 ratio based on the reserves shown on its books and accepted by the state authorities. According to those figures, Consumer Life qualified for tax purposes as a life insurance company. The Commissioner of Internal Revenue determined, however, that the A&H reserves held by American Bankers should be attributed to Consumer Life, thereby disqualifying the latter from favorable treatment. Consumer Life paid the deficiency assessed by the Commissioner and brought suit for a refund. The Court of Claims, disagreeing with its trial judge, held for the taxpayer.

## B

No. 75-1260, *First Railroad & Banking Company of Georgia* v. *United States.* The relevant taxable entity in this case is First of Georgia Life Insurance Co., a subsidiary of the petitioner First Railroad & Banking Co. of Georgia. Georgia Life was party to a Treaty II type agreement,[13] reinsuring its A&H policies with an insurance company, another subsidiary of First Railroad.[14] On the basis of the reserves carried on its books and approved by state authorities, Georgia Life quali-

---

companies, commonly pooling their efforts through the National Association of Insurance Commissioners (NAIC). Such examinations ordinarily include a thorough review of all reinsurance agreements. See generally NAIC, Examiners Handbook A30–A35 (3d ed. rev. 1970, 2d printing 1974). While these treaties were in effect, each company was examined twice, Consumer Life in 1959 and 1963, and American Bankers in 1960 and 1963. The Court of Claims found that the reinsurance treaties were examined in detail, and that the provisions for maintenance of reserves were approved in the course of all four examinations. 207 Ct. Cl., at 647, 524 F. 2d, at 1172.

[13] Some of the details differ from Treaty II in *Consumer Life,* but the differences are not important for present purposes.

[14] The Government does not seek to base attribution of reserves on this relationship. See n. 8, *supra.*

fied as a life insurance company for the years at issue here, 1961–1964. Consequently First Railroad excluded Georgia Life's income from its consolidated return, pursuant to § 1504 (b)(2) of the Code. The Commissioner determined that Georgia Life did not qualify for life insurance company status or exclusion from the consolidated return, and so assessed a deficiency. First Railroad paid and sued for a refund. It prevailed in the District Court, but the Court of Appeals for the Fifth Circuit reversed, relying heavily on *Economy Finance Corp.* v. *United States,* 501 F. 2d 466 (CA7 1974), cert. denied, 420 U. S. 947, rehearing denied, 421 U. S. 922 (1975), motion for leave to file second petition for rehearing pending, No. 74–701.

## C

No. 75–1285, *United States* v. *Penn Security Life Ins. Co.* Penn Security Life Insurance Co., a Missouri corporation, is, like Consumer Life, a subsidiary of a finance company. Under three separate Treaty I type agreements, it reinsured the life and A&H policies of three unrelated insurers during the years in question, 1963–1965. The other companies reported the unearned premium reserves, and the Missouri authorities approved this treatment. Because one of the three treaties did not contain a runoff provision like that present in *Consumer Life,* the Government conceded that the reserves held by that particular ceding company should not be attributed to the taxpayer. But the other two treaties were similar in all relevant respects to Treaty I in *Consumer Life.* After paying the deficiencies assessed by the Commissioner, Penn Security sued for a refund in the Court of Claims. Both the trial judge and the full Court of Claims ruled for the taxpayer.

## III

The Government commences its argument by suggesting that these reinsurance agreements were sham transactions

without economic substance and therefore should not be recognized for tax purposes. See, *e. g., Gregory* v. *Helvering,* 293 U. S. 465, 470 (1935); *Knetsch* v. *United States,* 364 U. S. 361 (1960). We do not think this is an accurate characterization.

Both taxpayers who were parties to Treaty I agreements entered into them only after arm's-length negotiation with unrelated companies. The ceding companies gave up a large portion of premiums, but in return they had recourse against the taxpayers for 100% of claims. The ceding companies were not just doing the taxpayers a favor by holding premiums until earned. This delayed payment permitted the ceding companies to invest the dollars, and under the treaties they kept all resulting investment income. Nor were they mere "paymasters," as the Government contends, for indemnity reinsurance of this type does not relieve the ceding company of its responsibility to policyholders. Had the taxpayers become insolvent, the insurer still would have been obligated to meet claims.[15]

Treaty II also served most of the basic business purposes commonly claimed for reinsurance treaties. See W. Hammond, Insurance Accounting Fire & Casualty 86 (2d ed. 1965); Dickerson 563–564. It reduced the heavy burden on the taxpayer's surplus caused by the practice of computing casualty reserves on the basis of gross unearned premiums even though the insurer may have paid out substantial sums in commissions and expenses at the commencement of coverage. By reducing this drain on surplus, the

---

[15] Treaty I type reinsurance is therefore different from the relation of agent and insurer found in *Superior Life Ins. Co.* v. *United States,* 462 F. 2d 945 (CA4 1972) (credit A&H premiums were held by the finance company until earned and only then paid to the insurance company; the court held that under state law the finance company was a mere agent and the insurance company would be treated as holding the unearned premium reserve).

taxpayer was able to expand its business, resulting in a broader statistical base that permitted more accurate loss predictions.[16] Through Treaty II each taxpayer associated itself with a reinsurance company more experienced in the field. Moreover, under Treaty II the taxpayers were shielded against a period of catastrophic losses. Even though the reinsurer would eventually recapture any such deep losses, it would be of substantial benefit to the ceding company to spread those payments out over a period of months or years. Both courts

---

[16] Surplus drain may be illustrated by the following example: A company issues a one-year A&H policy for a premium of $120, paying its agent a $60 commission at the time of issuance. The state insurance department will require the company to set up a reserve on the liability side of its balance sheet equivalent to the gross unearned premium—$120 at the beginning of coverage. But after paying the commission the company shows a cash asset of only $60. The $60 difference results in a $60 decrease in surplus.

As each month elapses, $10—one-twelfth of the annual premium— becomes "earned" and is therefore released from the reserve. A company whose business is level, writing new policies only as an equivalent number of old policies expire, will therefore experience no surplus drain, assuming that claims experience is within the expected range; the pro rata release from reserves as premiums become earned will match the burden imposed by new policies. But companies whose business is expanding, and especially new companies, will have a continuing surplus-drain problem. See generally Dickerson 606; *Utah Home Fire Ins. Co.* v. *Commissioner,* 64 F. 2d, at 764; n. 20, *infra.*

Reinsurance can provide amelioration. Assume the company in the example above reinsures half its business under a treaty with simpler provisions than Treaty I or Treaty II. This treaty calls for the reinsurer to establish a reserve equal to 50% of the gross unearned premium, in return for immediate payment of 50% of the primary insurer's net premium income. The primary company then takes credit against its reserve for the business ceded; its reserve is reduced from $120 to $60. At the same time it remits half its net income, $30, retaining a cash asset of $30. Each policy written on this basis therefore drains surplus only by $30, the difference between the $60 reserve and the $30 asset. Under the treaty the company can issue twice as many policies as before for the same total depletion in surplus.

below that passed on Treaty II agreements found expressly that the treaties served valid and substantial nontax purposes.[17] Tax considerations well may have had a good deal to do with the specific terms of the treaties, but even a "major motive" to reduce taxes will not vitiate an otherwise substantial transaction. *United States* v. *Cumberland Pub. Serv. Co.*, 338 U. S. 451, 455 (1950).[18]

## IV

Whether or not these were sham transactions, however, the Government would attribute the contested unearned premium reserves to the taxpayers because it finds in § 801 (c)(2) a rule that "insurance reserves follow the insurance risk." Brief for United States 34. This assertion, which forms the heart of the Government's case, is based on the following reasoning. Section 801 provides a convenient test for determining whether a company qualifies for favorable tax treatment as a life insurance company, a test determined wholly by the ratio of life reserves to total reserves. Reserves, under accepted accounting and actuarial standards, represent liabilities. Although often carelessly referred to as "reserve funds," or as being available to meet policyholder claims, reserves are not assets; they are entered on the liability side of the balance sheet. Under standard practice they are mathematically equivalent to the gross unearned premium dollars already

---

[17] *Consumer Life*, No. 75–1221, Pet. for Cert. 97a–98a, 100a, 105a (Findings of Fact Nos. 18, 19, 25, 37); *First Railroad*, No. 75–1260, Pet. for Cert. 14a–15a (District Court finding of fact accepted by the Court of Appeals, 514 F. 2d, at 677).

[18] The Government also relies on an asserted analogy to *Commissioner* v. *Hansen*, 360 U. S. 446 (1959). That case, dealing with a question of ordinary accrual accounting, is inapposite. Life insurance accounting is a world unto itself. See *Brown* v. *Helvering*, 291 U. S. 193, 201 (1934); *Great Commonwealth Life Ins. Co.* v. *United States*, 491 F. 2d 109 (CA5 1974). Mechanical application of ordinary accounting principles will not necessarily yield a sound result.

paid in, but conceptually the reserve—a liability—is distinct from the cash asset. This much of the argument is indisputably sound.

The Government continues: Since a reserve is a liability, it is simply an advance indicator of the final liability for the payment of claims. The company that finally will be responsible for paying claims—the one that bears the ultimate risk—should therefore be the one considered as having the reserves. In each of these cases, the Government argues, it was the taxpayer that assumed the ultimate risk. The other companies were merely paymasters holding on to the premium dollars until earned in return for a negligible percentage of the gross premiums.

## A

We may assume for present purposes that the taxpayers did take on all substantial risks under the treaties.[19] And in the broadest sense reserves are, of course, set up because of future risks. Cf. *Helvering* v. *Le Gierse*, 312 U. S. 531, 539 (1941). The question before us, however, is not whether the Government's position is sustainable as a matter of abstract logic.[20] Rather it is whether Congress intended a "reserves follow the risk" rule to govern determinations under § 801.

---

[19] It is not difficult to conceive of changes in the treaties, however, that would make it much harder to determine whether the other party bore a substantial risk. And if any risk that may be called substantial is sufficient to permit the parties to escape the attribution for which the Government argues, then surely a Government victory here would be short-lived. Cf. *Commissioner* v. *Brown*, 380 U. S. 563, 580 (1965) (Harlan, J., concurring).

[20] It is clear, in any event, that the traditional actuarial and accounting treatment of A&H reserves is not built entirely on a logic of risk. The premium charged the policyholder consists of two parts, an expense portion, or "loading," to cover commissions, administrative expenses, and profit, and a claims portion. Only the latter, the net premium or "morbidity" element, represents the company's estimate of what it must now

There is no suggestion in the plain language of the section that this is the case. See nn. 1 and 4, *supra.* If anything, the language is a substantial obstacle to accepting the Government's position. The word "risk" does not occur. Moreover, in § 801 (c)(2) Congress used the phrase "unearned premiums" rather than "unearned premium reserve." The Government argues that, taken in context, "unearned premiums" must be regarded as referring to reserves—to the liability account for unearned premium reserves and not the asset represented by the premium dollars. We agree that the reference is to reserves, but still the use of the truncated phrase suggests that Congress intended a mechanical application of the concept. In other words, this phrase suggests that in Congress' view unearned premium reserves always would be found in the same place as the unearned premiums themselves. If so, reserves would follow mechanically the premium dollars, as taxpayers contend, and would not necessarily follow the risk.

---

take in and invest to meet its responsibilities as claims arise; that is, only the latter represents the company's risk. The expense portion is relatively fixed. Nearly all of it is paid out, for commissions and administrative expenses connected with issuing the policy, at the time the premiums are received. Since these expenses already have been paid, the only future liabilities for which a reserve strictly is needed are claims. Nevertheless, state insurance departments uniformly require that A&H reserves be set up equivalent to the *gross* unearned premium. A&H reserves thus stand on a different footing from life insurance reserves, which are typically computed on the basis of mortality tables and assumed rates of interest. See § 801 (b). Life reserves contain no loading element.

Although gross unearned premium reserves may not strictly comport with a logic of risk, from the viewpoint of insurance regulators this approach yields advantages in simplicity of computation. Establishing the larger reserve also tends to assure conservative operation and the availability of means to pay refunds in the event of cancellation. See generally Mayerson, Ensuring the Solvency of Property and Liability Insurance Companies, in Insurance, Government and Social Policy 146, 171–172 (S. Kimball & H. Denenberg eds. 1969); Dickerson 604–606; *Utah Home Fire Ins. Co.* v. *Commissioner,* 64 F. 2d, at 764.

## B

The rather sparse legislative history furnishes no better support for the Government's position. Under the early Revenue Acts, all insurance companies were taxed on the same basis as other corporations. Both investment income and premium or underwriting income were included in gross income, although there was a special deduction for additions to reserves. See, *e. g.*, Revenue Act of 1918, § 234 (a)(10), 40 Stat. 1079.

By 1921 Congress became persuaded that this treatment did not accurately reflect the nature of the life insurance enterprise, since life insurance is often a form of savings for policyholders, similar in some respects to a bank deposit. See Hearings on H. R. 8245 before the Senate Committee on Finance, 67th Cong., 1st Sess., 83 (1921) (testimony of Dr. T. S. Adams, Tax Adviser to Treasury Department). Under this view, premium receipts "were not true income [to the life insurance company] but were analogous to permanent capital investment." *Helvering* v. *Oregon Mutual Life Ins. Co.*, 311 U. S. 267, 269 (1940). The 1921 Act therefore provided, for the first time, that life insurance companies would be taxed on investment income alone and not on premium receipts. Revenue Act of 1921, §§ 242–245, 42 Stat. 261. The same rationale did not apply to other forms of insurance, and Congress continued to tax insurance companies other than life on both underwriting and investment income. §§ 246–247.

The 1921 Act was thus built on the assumption that important differences between life and nonlife insurance called for markedly different tax treatment. Strict adherence to this policy rationale would dictate that any company insuring both types of risks be required to segregate its life and nonlife business so that appropriate tax rules could be applied to each. Congress considered this possibility but chose instead

a more convenient rule of thumb,[21] the 50% reserve ratio test.[22] The Treasury official primarily responsible for the 1921 Act explained:

> "Some companies mix with their life business accident and health insurance. It is not practicable for all companies to disassociate those businesses so that we have assumed that if this accident and health business was more than 50 per cent of their business, as measured by their reserves, it could not be treated as a life insurance company. On the other hand, if their accident and health insurance were incidental and represented less than 50 per cent of their business we treated them as a life insurance company." 1921 Hearings, *supra,* at 85 (testimony of Dr. T. S. Adams).

This passage constitutes the only significant reference to the test in the 1921 deliberations.

In succeeding years controversy developed over the preferential treatment enjoyed by life insurance companies. There were claims that they were not carrying their fair share of the tax burden. There were charges that stock companies were favored over mutuals, or vice versa. There was

---

[21] Since Congress thus has not adhered completely to the policy underlying its choice to tax life insurance companies differently from other insurance companies, we believe the court in *Economy Finance Corp.* v. *United States,* 501 F. 2d 466 (CA7 1974), relied too heavily on its reading of that policy in finding that unearned premium reserves should be attributed from the ceding company to the reinsurer in a Treaty I type agreement. See *Penn Security,* 207 Ct. Cl., at 608, 524 F. 2d, at 1162.

[22] Section 242 of the 1921 Act, 42 Stat. 261, provided:

"That when used in this title the term 'life insurance company' means an insurance company engaged in the business of issuing life insurance and annuity contracts (including contracts of combined life, health, and accident insurance), the reserve funds of which held for the fulfillment of such contracts comprise more than 50 per centum of its total reserve funds."

a nagging question over just how to compute a proper deduction for additions to reserves. Congress tried a host of different formulas to ameliorate these problems. See H. R. Rep. No. 34, 86th Cong., 1st Sess., 2–7 (1959); S. Rep. No. 291, 86th Cong., 1st Sess., 3–11 (1959); *Alinco Life Ins. Co. v. United States,* 178 Ct. Cl. 813, 831–837, 373 F. 2d 336, 345–349 (1967). But throughout these years the 50% test was not significantly changed.[23]

In 1959 Congress passed legislation that finally established a permanent tax structure for life insurance companies. Life Insurance Company Income Tax Act of 1959, 73 Stat. 112. For the first time since 1921, not only investment income but also a portion of underwriting income was made subject to taxation.[24] But even as Congress was rewriting the substantive provisions for taxing life insurance companies, it did not, despite occasional calls for change,[25] make any relevant alterations in § 801. Moreover, the few references to that provision

---

[23] In 1942 Congress did add a definition of "total reserves," specifying the same three elements that appear in the definition today. Revenue Act of 1942, § 163, 56 Stat. 867, amending § 201 (b) of the Internal Revenue Code of 1939. The 1942 committee reports take note of the addition, but do not elaborate. There is no glimmer of a "reserves follow the risk" rule. H. R. Rep. No. 2333, 77th Cong., 2d Sess., 109 (1942); S. Rep. No. 1631, 77th Cong., 2d Sess., 145 (1942).

[24] See n. 2, *supra.*

[25] During the hearings a number of witnesses and legislators expressed a concern that so-called specialty companies, particularly credit life insurance companies, were reaping excessive benefits from preferential life insurance company taxation. See, *e. g.,* Hearings before the Subcommittee on Internal Revenue Taxation of the House Committee on Ways and Means, 85th Cong., 2d Sess., 78, 242–244, 330, 422–434 (1958); Hearings on H. R. 4245 before the Senate Committee on Finance, 86th Cong., 1st Sess., 84–85 (1959). Some proposed to deny them these benefits by altering the definition in § 801. See House Hearings, *supra,* at 78, 330; Senate Hearings, *supra,* at 85. No one addressed the question of reserve allocation under reinsurance contracts like those involved here, but Congress clearly was made aware that § 801 often led to what some considered undesirable results

in the committee reports shed little light on the issue presented here.[26] They contain no explicit or implicit support for a rule that reserves follow the risk.

## C

More important than anything that appears in hearings, reports, or debates is a provision added in 1959, § 820, concerning modified coinsurance contracts between life insurance companies.[27] This section, although designed to deal with a

when applied to credit life insurance companies. See also H. R. Rep. No. 1098, 84th Cong., 1st Sess., 3–7 (1955); S. Rep. No. 1571, 84th Cong., 2d Sess., 3–8 (1956).

[26] H. R. Rep. No. 34, 86th Cong., 1st Sess., 22–23 (1959); S. Rep. No. 291, 86th Cong., 1st Sess., 41–44 (1959).

[27] Section 820 provides in relevant part:

"§ 820. Optional treatment of policies reinsured under modified coinsurance contracts.

"(a) In general.

"(1) Treatment as reinsured under conventional coinsurance contract.

"Under regulations prescribed by the Secretary or his delegate, an insurance or annuity policy reinsured under a modified coinsurance contract (as defined in subsection (b)) shall be treated, for purposes of this part (other than for purposes of section 801), as if such policy were reinsured under a conventional coinsurance contract.

"(2) Consent of reinsured and reinsurer.

"Paragraph (1) shall apply to an insurance or annuity policy reinsured under a modified coinsurance contract only if the reinsured and reinsurer consent, in such manner as the Secretary or his delegate shall prescribe by regulations—

"(A) to the application of paragraph (1) to all insurance and annuity policies reinsured under such modified coinsurance contract, and

"(B) to the application of the rules provided by subsection (c) and the rules prescribed under such subsection.

"Such consent, once given, may not be rescinded except with the approval of the Secretary or his delegate.

"(b) Definition of modified coinsurance contract.

"For purposes of this section, the term 'modified coinsurance contract' means an indemnity reinsurance contract under the terms of which—

"(1) a life insurance company (hereinafter referred to as 'the rein-

problem different from the one presented here, is simply unintelligible if Congress thought that § 801 embodied an unvarying rule that reserves follow the risk.

A conventional coinsurance contract is a particular form of indemnity reinsurance.[28] The reinsurer agrees to reimburse the ceding company for a stated portion of obligations arising out of the covered policies. In return, the reinsurer receives a similar portion of all premiums received by the insurer, less a ceding commission to cover the insurer's overhead. The reinsurer sets up the appropriate reserve for its proportion of the obligation and, as is customary, the ceding company takes

surer') agrees to indemnify another life insurance company (hereinafter referred to as 'the reinsured') against a risk assumed by the reinsured under the insurance or annuity policy reinsured,

"(2) the reinsured retains ownership of the assets in relation to the reserve on the policy reinsured,

"(3) all or part of the gross investment income derived from such assets is paid by the reinsured to the reinsurer as a part of the consideration for the reinsurance of such policy, and

"(4) the reinsurer is obligated for expenses incurred, and for Federal income taxes imposed, in respect of such gross investment income.

"(c) Special rules.

"Under regulations prescribed by the Secretary or his delegate, in applying subsection (a)(1) with respect to any insurance or annuity policy the following rules shall (to the extent not improper under the terms of the modified coinsurance contract under which such policy is reinsured) be applied in respect of the amount of such policy reinsured:

.        .        .        .        .

"(3) Reserves and assets.

"The reserve on the policy reinsured shall be treated as a part of the reserves of the reinsurer and not of the reinsured, and the assets in relation to such reserve shall be treated as owned by the reinsurer and not by the reinsured."

[28] Coinsurance carries a substantially different meaning in the life insurance field than it does in the case of liability or property insurance. See Steffen, Life and Health Reinsurance, in Life and Health Insurance Handbook 1035 n. 1 (D. Gregg ed. 1964); S. Huebner, K. Black, & R. Cline, Property and Liability Insurance 95–100 (2d ed. 1976).

credit against its reserves for the portion of the risks reinsured.

A modified coinsurance contract is a further variation in this esoteric area of insurance. As explained before the Senate Finance Committee, a modified form of coinsurance developed because some major reinsurers were not licensed to do business in New York, and New York did not permit a ceding company to take credit against its reserves for business reinsured with unlicensed companies. Hearings on H. R. 4245 before the Senate Committee on Finance, 86th Cong., 1st Sess., 608 (1959) (statement of Henry F. Rood). Denial of credit places the ceding company in an undesirable position. It has depleted its assets by paying to the reinsurer the latter's portion of premiums, but its liability account for reserves remains unchanged. Few companies would accept the resulting drain on surplus, and unlicensed reinsurers wishing to retain New York business began offering a modified form of coinsurance contract. Obligations would be shared as before, but the ceding company, which must in any event maintain 100% of the reserves, would be permitted to retain and invest the assets backing the reserves. As consideration for this right of retention, modified coinsurance contracts require the ceding company to pay to the reinsurer, under a complicated formula, the investment income on the reinsurer's portion of the investments backing the reserve. See *id.,* at 609; E. Wightman, Life Insurance Statements and Accounts 150–151 (1952); D. McGill, Life Insurance 435–440 (rev. ed. 1967).

The 1959 legislation, as it passed the House, contained no special treatment for these modified contracts. The income involved therefore would have been taxed twice, once as investment income to the ceding company and then as underwriting income to the reinsurer.[29] The Senate thought this double taxation inequitable, and therefore added § 820, to which the House agreed. That section provides that for tax

---

[29] This was not a problem under prior law, since the underwriting income of life insurance companies was not taxed.

purposes modified coinsurance contracts shall be treated the same as conventional coinsurance contracts, if the contracting parties consent to such treatment. For consenting companies Congress not only provided that gross investment income shall be treated as if it were received directly (in appropriate share) by the reinsurer, § 820 (c) (1), but also expressly declared that the reserves "shall be treated as a part of the reserves of the reinsurer and not of the reinsured." § 820 (c) (3).

Under a modified coinsurance contract the reinsurer bears the risk on its share of the obligations. Thus, if § 801 mandates that reserves follow the risk, the reinsurer could not escape being considered as holding its share of the reserve. Section 820 (c) (3), providing for attribution of the reserves to the reinsurer, would be an elaborate redundancy. And although § 820 (a) (2) specifies that attribution under § 820 is optional, requiring the consent of the parties, the parties would in fact have no option at all. Plainly § 820 is incompatible with a view that § 801 embodies a rule that reserves follow the risk.[30]

---

[30] This conclusion is not weakened by the provision in § 820 (a) (1) that the special treatment under § 820 shall not apply for purposes of § 801. This exception simply means that for purposes of § 801 the reserves are invariably treated as held by the ceding company; the companies are unable to elect to have those reserves follow the risk. Cf. Rev. Rul. 70–508, 1970–2 Cum. Bull. 136, described in the text *infra*.

The Government argues that § 820 has no bearing on attribution of A&H reserves since it applies only to reinsurance agreements in the life insurance field. We find this unpersuasive. The Government derives its "reserves follow the risk" rule from the definition of "reserve" and the fact that a reserve is a liability, not an asset. See *supra*, at 739–740. Life reserves are as much liabilities as are A&H reserves. Although there are important differences in the ways the two are computed, see n. 20, *supra*, none of those differences are germane to the reasoning by which the Government derives its rule. Either the "reserves follow the risk" rule is valid for all insurance risks or it is valid for none.

The Commissioner himself, interpreting § 801 in light of § 820, has implicitly acknowledged that reserves do not follow the risk. Rev. Rul. 70–508, 1970–2 Cum. Bull. 136. Advice was requested by the parties to a modified coinsurance contract who had not elected the special treatment available under § 820. The ceding company had carried the life insurance reserves on its books, although the reinsurer bore the ultimate risk. The ceding company wanted to know whether it could count those reserves in its ratio for purposes of § 801. Relying on § 801 (b) and the Treasury Regulations implementing it, the Commissioner ruled that it could. A "reserves follow the risk" rule would have dictated precisely the opposite result.

## D

Section 820 affords an unmistakable indication that § 801 does not impose the "reserves follow the risk" rule. Instead, Congress intended to rely on customary accounting and actuarial practices, leaving, as § 820 makes evident, broad discretion to the parties to a reinsurance agreement to negotiate their own terms. This does not open the door to widespread abuse. "Congress was aware of the extensive, continuing supervision of the insurance industry by the states. It is obvious that subjecting the reserves to the scrutiny of the state regulatory agencies is an additional safeguard against overreaching by the companies." *Mutual Benefit Life Ins. Co.* v. *Commissioner,* 488 F. 2d 1101, 1108 (CA3 1973), cert. denied, 419 U. S. 882 (1974). See *Lamana-Panno-Fallo Industrial Ins. Co.* v. *Commissioner,* 127 F. 2d 56, 58–59 (CA5 1942); *Alinco Life Ins. Co.* v. *United States,* 178 Ct. Cl., at 831, 373 F. 2d, at 345. See also *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 429–433 (1946); 15 U. S. C. § 1011 (McCarran-Ferguson Act). In presenting the 1959 legislation to the full House, members of the committee that drafted the bill were careful to underscore the continuing primacy of state

regulation, with specific reference to the question of reserves.[31]

In two of the cases before us the courts below expressly found that the reserves were held in accordance with accepted actuarial and accounting standards,[32] while the third court did not address the issue. In all three, it was found that no state insurance department required any change in the way the taxpayers computed and reported their reserves.[33] Since the taxpayers neither held the unearned premium dollars nor set up the corresponding unearned premium reserves, and since that treatment was in accord with customary practice as policed by the state regulatory authorities, we hold that § 801 (c)(2) does not permit attribution to the taxpayers of the reserves held by the other parties to the reinsurance treaties.[34]

V

The Government argues that even if attribution of reserves is not required under § 801 (c)(2), attribution is required

---

[31] See 105 Cong. Rec. 2569, 2576–2577 (1959) (remarks of Reps. Mills and Simpson, chairman and ranking minority member, respectively, of the Subcommittee on Internal Revenue Taxation).

[32] See *Consumer Life*, No. 75–1221, Pet. for Cert. 108a (Finding of Fact No. 47); *First Railroad*, No. 75–1260, Pet. for Cert. 16a (finding by the District Court; the Court of Appeals did not take issue with this finding).

[33] *Consumer Life*, 207 Ct. Cl., at 643–647, 524 F. 2d, at 1170–1172; *First Railroad*, No. 75–1260, Pet. for Cert. 16a (finding by the District Court), noted without disapproval by the Court of Appeals, 514 F. 2d, at 677 n. 8; *Penn Security*, 207 Ct. Cl., at 599, 524 F. 2d, at 1157. See also *Penn Security*, No. 75–1285, Pet. for Cert. 48a (Finding of Fact No. 29).

[34] The current statute bases the § 801 determination on reserves, not on other criteria Congress could have chosen that might arguably give a better indication of the relative importance of a company's life insurance business. See *Economy Finance Corp.* v. *United States*, 501 F. 2d, at 483 (Stevens, J., dissenting). We, of course, are called upon to apply the statute as it is written. Furthermore, the interpretation for which the Government contends "would have wide ramifications which we are not prepared to visit upon taxpayers, absent congressional guidance in this direction." *Commissioner* v. *Brown*, 380 U. S., at 575. If changes are thought necessary, that is Congress' business.

under § 801 (c)(3), counting in total reserves "all other insurance reserves required by law." See n. 4, *supra*. Under state statutory law, the Government suggests, these taxpayers were required to set up and maintain the full unearned premium reserves.

Our attention is drawn to no statute in any of the affected States that expressly requires this result. Instead the Government returns to its main theme and asserts, in essence, that certain general state statutory provisions embody the doctrine that reserves follow the risk.[35] We would find it difficult to infer such a doctrine from the statutory provisions relied on by the Government even if there were no other indications to the contrary. But other indications are compelling. The insurance departments of the affected States consistently accepted annual reports showing reserves held as the taxpayers claim they should be.[36] It is well established

---

[35] For example, Ariz. Rev. Stat. Ann. § 20–506 (1975) provides in part that "every insurer shall maintain an unearned premium reserve on all policies in force." Under § 20–104, " 'Insurer' includes every person engaged in the business of making contracts of insurance." Section 20–103 of the Arizona statute defines "insurance" as "a contract whereby one undertakes to indemnify another . . . ." After summarizing these provisions the Government concludes: "The significant aspect of these state statutes is that they require the establishment of a reserve by the company that is ultimately liable to meet policy claims whether or not it has actually received the premiums for the coverage." Brief for United States 69–70. We do not think these general provisions can be read to support such a sweeping conclusion.

[36] In *Consumer Life* and *First Railroad* the Government introduced the testimony of certain insurance department officials from Arizona and Georgia. They indicated that the omission of unearned premium reserves from these two taxpayers' annual reports was permitted "unwittingly" or only because the departments were unfamiliar at the time with these types of reinsurance agreements. But we do not think this after-the-fact testimony from single officials should outweigh the formal, official approval rendered under the names of the commissioners after opportunity for full review. Moreover, this formal approval withstood careful triennial audits. See n. 12, *supra*.

that the consistent construction of a statute "by the agency charged with its enforcement is entitled to great deference by the courts." *NLRB* v. *Boeing Co.*, 412 U. S. 67, 75 (1973). See *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205, 210 (1972); *Udall* v. *Tallman*, 380 U. S. 1, 16–18 (1965); *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 139–140 (1944). This is no less the rule when federal courts are interpreting state law administered by state regulatory officials,[37] at least where, as here, there is no reason to think that the state courts would construe the statute differently. We find no basis for holding that taxpayers were required by law, within the meaning of § 801 (c)(3), to maintain the disputed unearned premium reserves.[38]

---

[37] The relevant Treasury Regulations also seem to make state practice determinative:

"[T]he term 'reserves required by law' means reserves which are required either by express statutory provisions or by rules and regulations of the insurance department of a State, Territory, or the District of Columbia when promulgated in the exercise of a power conferred by statute, *and* which are *reported in the annual statement of the company and accepted by state regulatory authorities* as held for the fulfillment of the claims of policyholders or beneficiaries." Treas. Reg. § 1.801–5 (b) (1960) (emphasis added).

See also § 1.801–5 (a) (indicating that the reserve "must have been actually held during the taxable year for which the reserve is claimed").

[38] The Government suggests that state regulatory practice cannot be deemed controlling under the doctrine of *McCoach* v. *Insurance Co. of North America*, 244 U. S. 585 (1917) and the many cases in this Court that followed it. See, *e. g.*, *United States* v. *Boston Ins. Co.*, 269 U. S. 197 (1925); *New York Ins. Co.* v. *Edwards*, 271 U. S. 109 (1926); *Helvering* v. *Inter-mountain Life Ins. Co.*, 294 U. S. 686 (1935). Those cases held that certain reserves mandated by state insurance authorities were not reserves "required by law" within the meaning of the early Revenue Acts, because they were not technical insurance reserves. In those cases, however, the question was not whether the taxpayers qualified for preferential tax treatment. Rather, the question was whether the taxpayers would be allowed a deduction for additions to various reserves, and the skeletal provisions of the earlier Acts necessitated a restrictive view. See *McCoach,*

## VI

For the reasons stated, we hold for the taxpayers. The judgments in Nos. 75–1221 and 75–1285 are affirmed. The judgment in No. 75–1260 is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE WHITE, with whom MR. JUSTICE MARSHALL joins, dissenting.

The Court today makes it possible for insurance companies doing almost no life insurance business to qualify for major tax advantages Congress meant to give only to companies doing mostly life insurance business. I cannot join in the creation of this truckhole in the law of insurance taxation.

## I

Congress has chosen to give life insurance companies extremely favorable federal income tax treatment. The reason for this preferential tax treatment is the nature of life insurance risks. They are long-term risks that increase over the period of coverage and that will ultimately require the payment of a claim. Companies that assume life insurance risks therefore must accumulate substantial reserve funds to meet future claims; these reserve funds are invested, and a large portion of the investment income is then added to the funds already accumulated. In recognition of the special

---

*supra*, at 589. The same restrictive view is not appropriate for purposes of applying § 801. See *National Protective Ins. Co.* v. *Commissioner*, 128 F. 2d 948, 950–952 (CA8), cert denied, 317 U. S. 655 (1942). Moreover, those early cases generally have little bearing on questions that arise under the more recent enactments. The definition of "life insurance reserves" that now appears in § 801 (b), and which originated with the 1942 Revenue Act, substantially replaced the problematic concept of technical reserves developed in *McCoach*. See *United States* v. *Occidental Life Ins. Co.*, 385 F. 2d 1, 4–7 (CA9 1967).

characteristics of life insurance risks, Congress has allowed a substantial portion of life insurance company income to escape taxation.[1]

Other types of insurance, such as the accident and health (A&H) coverage provided by the taxpayers in these cases, do not involve the assumption of long-term risks that inevitably will require the payment of benefits at some point in the relatively distant future. Consequently, Congress has provided for taxation of such nonlife insurance companies in much the same manner as any other corporation. See Internal Revenue Code of 1954, §§ 831, 832, 26 U. S. C. §§ 831, 832. Many companies mix nonlife insurance business with their life insurance business, and Congress has decided to tax such "mixed" enterprises according to whether the majority of the company's business is life or nonlife:

> "[I]f this accident and health business was more than 50 per cent of their business, as measured by their reserves, it could not be treated as a life insurance company. On the other hand, if their accident and health insurance were incidental and represented less than 50 per cent of their business we treated them as a life insurance company." Hearings on H. R. 8245 before the Senate Committee on Finance, 67th Cong., 1st Sess., 85 (1921) (testimony of Dr. T. S. Adams, Tax Adviser to the Treasury Department), also quoted *ante,* at 743.

---

[1] Life insurance company taxable income is calculated by a complicated three-stage process outlined in *Jefferson Standard Life Ins. Co.* v. *United States,* 408 F. 2d 842, 844–846 (CA4), cert. denied, 396 U. S. 828 (1969). The end result of these intricate calculations is a substantial narrowing of the tax base of such companies. See Clark, The Federal Income Taxation of Financial Intermediaries, 84 Yale L. J. 1603, 1637–1664 (1975). In addition to deferring taxation on 50% of underwriting income, *ante,* at 728 n. 2, life insurance companies are not taxed on an estimated 70% to 75% of their net investment income. Clark, *supra,* at 1642–1643, and n. 152. See *United States* v. *Atlas Life Ins. Co.,* 381 U. S. 233, 236–237, 247–249 (1965).

In order to measure the proportion of life insurance business done by an insurance company, Congress used the fraction of total insurance reserves consisting of life insurance reserves, as defined by § 801. The purpose of this reserve-ratio test is, of course, to determine whether a majority of an insurance company's business is life insurance.[2]

More than 50% of the business of the taxpayer insurance companies for the taxable years in question here was nonlife rather than life insurance business, as measured by the reserves accumulated to cover all life and nonlife risks assumed by the taxpayers.[3] The taxpayers sought to obtain preferential treatment as life insurance companies under § 801 by arranging with other companies to hold the necessary reserves for the taxpayers. I agree with the majority that these arrangements had economic substance in that the companies holding the reserves performed two additional

---

[2] In order to qualify under § 801 as a "life insurance company," the taxpayer first must qualify as an "insurance company." For this purpose, as well as for qualifying as a "life insurance company," the "primary and predominant business activity" of the company determines its tax status:

"The term 'insurance company' means a company whose primary and predominant business activity during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies. Thus, though its name, charter powers, and subjection to State insurance laws are significant in determining the business which a company is authorized and intends to carry on, *it is the character of the business actually done in the taxable year which determines whether a company is taxable as an insurance company* under the Internal Revenue Code." Treas. Reg. § 1.801-3 (a)(1) (1972). (Emphasis added.)

[3] The majority assumes that "the taxpayers did take on all substantial risks" under the arrangements by which the A&H reserves in relation to these risks were held by other companies. *Ante,* at 740. The taxpayers concede and the courts below found that if these A&H reserves are attributable to the taxpayers, they do not qualify as life insurance companies under the reserve-ratio test. 207 Ct. Cl. 638, 645, 524 F. 2d 1167, 1171 (1975); 207 Ct. Cl. 594, 604–605, 524 F. 2d 1155, 1160 (1975); 514 F. 2d 675 (CA5 1975).

functions for the taxpayers: a clearinghouse function, collecting premiums and paying out claims, and a financing function, lending the difference between the reserves established for the policy and the premiums, less selling expenses, received from the policyholder. See *ante,* at 737–738, and n. 16; *Economy Finance Corp.* v. *United States,* 501 F. 2d 466, 477–478 (CA7 1974), cert. denied, 420 U. S. 947, rehearing denied, 421 U. S. 922 (1975), motion for leave to file second petition for rehearing pending, No. 74–701. But I cannot agree that these arrangements enable the taxpayers to qualify for tax savings Congress intended to give only to insurance companies whose predominant business is the assumption of insurance risks.

## II

The majority holds that the taxpayers may obtain these tax savings despite the predominantly nonlife character of their insurance business, "[s]ince the taxpayers neither held the unearned [A&H] premium dollars nor set up the corresponding unearned premium reserves, and since that treatment was in accord with customary practice as policed by the state regulatory authorities . . . ." *Ante,* at 750. This rule would permit an A&H insurance company to qualify for preferential treatment as a life insurance company by selling a few life policies and then arranging, by means similar to those employed here, for a third party to hold the A&H premiums and the corresponding reserves. Under the majority's rule, these reserves held by the third party to cover risks assumed by the A&H company would not be attributed to that company; its total reserves for purposes of § 801 would consist almost entirely of whatever life insurance reserves it held; and the company would satisfy the reserve-ratio test.[4] I

---

[4] The majority evidently hopes that state regulatory authorities will prevent "widespread abuse" of this type, *ante,* at 749, by requiring a company assuming insurance risks to hold the corresponding reserves. But, as the Court of Claims below in No. 75–1221 observed, the goal of

cannot believe that Congress intended to allow an insurance company to shelter its nonlife insurance income from taxation merely by assuming an incidental amount of life insurance risks and engaging another company to hold its reserves through arrangements with the requisite economic substance and state regulatory approval to satisfy the standard announced by the majority today.

The language of § 801 and its accompanying regulations does not require such a result.   Section 801 (a) provides that any insurance company may qualify as a life insurance company "if *its* life insurance reserves . . . comprise more than 50 percent of *its* total reserves . . ." (emphasis added); § 801 (c)(2) includes "unearned premiums" in the definition

state insurance regulation is not to protect the federal treasury from tax avoidance by insurance companies doing predominantly nonlife business, but rather to protect policyholders by making sure that funds are set aside out of premium receipts for payment of claims.  207 Ct. Cl., at 645, 524 F. 2d, at 1171.  The majority suggests no reason why, as long as the insurer has made some arrangement for the establishment of reserves, the state regulatory authorities will care who holds them.

The majority's hope that the States will prevent insurance companies from taking advantage of the loophole it has created is further undermined by its holding that the A&H reserves involved in these cases were not attributable to the taxpayers under § 801 (c)(3) as "other insurance reserves required by [state] law." *Ante,* at 750–752.  The majority reasons that the taxpayers were not required by state law to maintain these A&H reserves because "[t]he insurance departments of the affected States consistently accepted annual reports showing reserves held as the taxpayers claim they should be." *Ante* at 751.  (Footnote omitted.)  The majority relies on this failure of state regulatory authorities to require inclusion of the A&H reserves in the taxpayers' annual statements, despite uncontradicted testimony of state insurance officials that the reason for this failure was the state officials' unfamiliarity with these particular arrangements purporting to shift reserves to non-risk-bearing companies. *Ante,* at 751 n. 36.  Thus, if a company's arrangements for shifting reserve allocations are sufficiently novel, complex, or well disguised in its annual statements to escape detection by state insurance officials, state regulation will not help at all to close the door to widespread federal income tax avoidance.

of "total reserves" for purposes of § 801 (a). It is clear that, as required by Treasury Regulations, unearned premium reserves were set up to "cover the cost of carrying the [A&H] insurance risk for the period for which the premiums have been paid in advance," Treas. Reg. § 1.801–3 (e) (1972), and that these reserves "have been actually held during the taxable year[s]" at issue here. § 1.801–5 (a)(3) (1960). The question is whether the A&H reserves set up to cover risks assumed by each taxpayer are considered to be "its" reserves even though they are in the physical possession and under the nominal control of another company.

The Regulations explicitly answer this question in the affirmative for life insurance reserves:

> "[Life insurance] *reserves held by the company with respect to the net value of risks reinsured in other solvent companies . . . shall be deducted from the company's life insurance reserves.* For example, if an ordinary life policy with a reserve of $100 is reinsured in another solvent company on a yearly renewable term basis, and the reserve on such yearly renewable term policy is $10, the reinsured company shall include $90 ($100 minus $10) in determining its life insurance reserves." § 1.801–4 (a)(3) (1972). (Emphasis added.)

Accord, § 1.801–4 (d)(5). Thus, for purposes of the reserve-ratio test of § 801, life insurance reserves are attributable to the company assuming the risk under a reinsurance agreement. The same attribution rule should be used in calculating the denominator of the reserve ratio (life plus nonlife reserves) as for the numerator (life reserves); as the majority recognizes, *ante,* at 748 n. 30, there is no reason not to adopt a consistent approach to allocation of both life and nonlife reserves in determining life insurance company status.

The rule that life and nonlife reserves are attributable to the risk bearer reflects the familiar principles of cases such as *Lucas* v. *Earl,* 281 U. S. 111 (1930), where income earned by

a taxpayer was attributed to him notwithstanding a contractual arrangement under which the income was paid over to a third party. In that case, the salary derived from the taxpayer's business activity was treated as "his" income even though he did not receive or hold it. Similarly, the reserves applicable to the A&H insurance business of each of the taxpayers here should be treated as "its" reserves. Cf. *Commissioner* v. *Hansen*, 360 U. S. 446 (1959).[5]

## III

The majority insists nonetheless that these predominantly nonlife insurance companies be given preferential tax treatment intended only for predominantly life insurance companies. To reach this result, the majority relies, not on the language or legislative history of the § 801 reserve-ratio test, but on § 820 of the Code, which was added nearly 40 years after the reserve-ratio test was adopted and which gives life insurance companies the choice of whether to have reserves

---

[5] In *Hansen*, accrual-basis automobile dealers had sold customer installment obligations to finance companies, who required the dealers to reimburse them for losses arising from nonpayment by the customers. To cover this risk of loss, the dealers retained a portion of the purchase price of the obligations as a reserve. The funds in these reserve accounts were ultimately paid over to the dealers, less amounts applied to cover the losses from nonpayment. The Court held that these reserve accounts were income that accrued to the dealers when the accounts were established, because at that time the reserve funds "were vested in and belonged to the respective dealers, subject only to their . . . contingent liabilities to the finance companies." 360 U. S., at 463. Similarly, the taxpayers in these cases allowed other parties to retain the purchase price of A&H insurance policies and to apply part of those funds to the payment of taxpayers' contingent liabilities under the A&H policies; the balance, as in *Hansen*, was remitted to the taxpayers. These reserves, like the dealer reserves held by the finance companies in *Hansen*, should be attributed to the risk bearers for tax purposes.

The majority distinguishes *Hansen* by fiat, stating only that "[l]ife insurance accounting is a world unto itself." *Ante*, at 739 n. 18. This is hardly a reason to ignore accepted principles of federal income taxation.

under certain "modified coinsurance contracts" attributed to the reinsurer who bears the risk or to the reinsured who holds the reserves under the contract. See *ante,* at 745–748. The majority finds this section at once "redundan[t]" and "incompatible" with the Commissioner's interpretation of § 801. *Ante,* at 748. What the majority overlooks is that § 820 applies *only* to companies that have *already qualified as life insurance companies* by virtue of § 801; it prescribes, not how those companies qualify for life insurance company status, but rather how they are to be taxed once they have qualified for such status—specifically, how they can avoid double taxation on investment income received by the reinsurer but paid over to the reinsured pursuant to the particular type of reinsurance contract defined in § 820 (b). The option to attribute reserves for these contracts either to the reinsurer or the reinsured is given only to life insurance companies which qualify under § 801, see § 820 (b)(1), and is expressly made inapplicable "for purposes of section 801" in determining whether they so qualify, § 820 (a)(1).

The majority notes that § 820 (a)(1) denies insurance companies the choice of how to allocate their modified coinsurance contract reserves for purposes of the § 801 reserve-ratio test, but interprets this exception to § 820 to "[mean] that for purposes of § 801 the reserves are invariably treated as held by the ceding company. . . ." *Ante,* at 748 n. 30. This "explanation" simply assumes the conclusion that the majority is attempting to justify: What the parties to these cases are arguing about is whether for § 801 purposes reserves are invariably attributable to the company holding them rather than to the company bearing the risks that the reserves were set up to cover. Mandatory attribution to the risk bearer under § 801 is just as consistent with the inapplicability of the § 820 option as is mandatory attribution to the holder of those reserves, and is more consistent with the attribution rule prescribed by the Regulations for life insurance reserves. See

*supra,* at 758. Moreover, the definition of nonlife reserves under §§ 801 (c)(2) and (3) is explicitly made applicable only "[f]or purposes of [the] subsection [801] (a)" reserve-ratio test. The attribution rule at issue in these cases thus does not apply to the § 820 rules for taxing the income of life insurance companies from modified coinsurance contracts (or to the taxation of any other insurance income). In short, the majority's conclusion that § 820 "affords an unmistakable indication" of congressional intent with respect to attribution of reserves under § 801, *ante,* at 749, is refuted by the language of the Code itself.[6]

For the reasons stated, I respectfully dissent.

---

[6] The majority attempts to find support for its position in a Revenue Ruling requested by the parties to a modified coinsurance contract under § 820 (b). Rev. Rul. 70–508, 1970–2 Cum. Bull. 136. As permitted by § 820 (a), the parties chose to attribute to the reinsured company the reserves on the portion of the risks reinsured with the other company. The reinsured company was assumed to be a life insurance company for purposes of § 801; the question was how its reserves should be calculated for purposes of the tax on life insurance companies imposed under § 802. See Rev. Rul. 70–508, *supra.* Because the definition of life insurance company reserves in § 801 (b) is used to define "life insurance company taxable income" under § 802, see §§ 802 (b), 804 (a)(1), 805 (a) and (c), the Commissioner had to decide whether the reserves in question were within the § 801 (b) definition for purposes of calculating the tax imposed under § 802. In ruling that the reserves did come within this definition, the Commissioner did not decide how reserves should be attributed for companies seeking to qualify for life insurance company status. That issue was not before him, because the companies had already qualified.